**Floyd E. WILHITE, Plaintiff-Appellant,**

**v.**

**Luther and Glen HURD, d/b/a Springfield Tire Exchange, Hawkeye-Security Insurance Company, and State Treasurer, State of Missouri, Custodian, Second Injury Fund, Defendants-Appellants.**

**No. 52044.**

Supreme Court of Missouri, Division No. 1.

Jan. 9, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 13, 1967.

Neale, Newman, Bradshaw, Freeman & Neale, Warren S. Stafford, Springfield, for plaintiff-appellant.

Buell F. Weathers, David P. Hargrave, Mann, Walter, Burkart, Weathers & Schroff, Springfield, for defendants-appellants Luther and Glen Hurd, d/b/a Springfield Tire Exchange, and Hawkeye-Security Ins. Co.

Norman H. Anderson, Atty. Gen., Jefferson City, Donald L. Randolph, Asst. Atty. Gen., for defendants.

HIGGINS, Commissioner.

Floyd E. Wilhite claimed compensation from his employers, Luther and Glen Hurd, d/b/a Springfield Tire Exchange, and their workmen's compensation insurer, Hawkeye-Security Insurance Company, for alleged injury to eye and head on February 11, 1959, and from the State Treasurer of Missouri, Custodian, Second Injury Fund, alleging pre-existing disability due to cataract in his left eye. Referee Leonard Newton of the Division of Workmen's Compensation entered an award of total and permanent disability against the employer and insurer and the Second Injury Fund. The Industrial Commission modified the Referee's award to an award of compensation for permanent partial disability of the sight of plaintiff's right eye and, upon further review, the Circuit Court in part reversed the Industrial Commission. All parties, including the State Treasurer, have appealed.

On February 11, 1959, plaintiff was operating a tire spreader at his employer's place of business when a large truck tire slipped from the spreader and struck him on the forehead knocking him to the floor. He was not rendered unconscious and he reported the accident to his employers. Shortly thereafter, he experienced a severe headache, "black marks" floating across his right eye, and had a feeling of "slashing water" in that eye. He continued to work until February 18, 1959, when he saw Dr. Robert Stewart, an eye specialist. He was then blind in his right eye and Dr. Stewart diagnosed the injury as a retina detachment of the right eye. During the next four months plaintiff was in the hospital on two occasions and Dr. Stewart performed three separate operations on plaintiff's right eye to correct the detached retina. The operations were not successful and plaintiff could see only light with his right eye.

Plaintiff returned to his job in June, 1959, and worked for approximately nine months before being discharged for causes not related to his injury. He had no trouble doing the same work he had done before the accident and he had also resumed his driving and reading.

On May 21, 1960, plaintiff filed a claim for compensation against his employers and their insurer. He alleged injury to "eyes and head * * * Retina detachment of right eye and injury to left eye. Head was also injured." On March 6, 1961, plaintiff and his attorney and the employers and their insurer by their attorney appeared before Referee Leonard E. Newton at which time plaintiff asked that his claim be dismissed "so that a rating of permanent disability" could be made. Pursuant to the request, Referee Newton dismissed plaintiff's claim without prejudice and made the following additional record entry: "Compensation rate $37.50, compensation has been paid in the amount of $600.00 for 16 weeks healing period, medical is being furnished in the amount of $1618.80, permanent partial disability right eye rated at 92% loss or 128.8 weeks or $4830.00, facial disfigurement for the up-turning of right eye ball rated at $200.00 total or $5030.00 together with healing period of $600.00 makes a total of $5630.00. Mr. Weathers (attorney for employers and insurer), do you agree to the rating as dictated? Mr. Weathers: Yes, Your Honor."

The last payment pursuant to the foregoing rating was made November 28, 1961, and on January 2, 1962, plaintiff again filed his claim for compensation against his employers and their insurer and the custodian of the Second Injury Fund. He alleged injury to "Eyes and head—Preexisting disability being industrial blindness of left eye due to cataract * * * Retina detachment of right eye and head injury. Further injury to left eye. Worsening of nervous condition. Nervous and mental condition." The Referee's hearing was commenced February 26, 1963, and re-

cessed from time to time, being concluded October 2, 1963.

Mr. Wilhite was 44 years of age at the hearing and had done tire repair work for the Hurds' Springfield Tire Exchange for approximately three years prior to the accident on February 11, 1959. Previous to that employment he worked approximately fifteen years for DeWayne Mattress Company in Detroit, Michigan, and had no eye trouble or nervousness. The "black marks" and "slashing water" noticed shortly after the accident were the only unusual conditions present in either eye. "The right eye was the only thing I was concerned in at that time." The condition of plaintiff's eyes and sight prior to the accident was described: "I drove an automobile all the time, I made trips whenever I wanted to, I worked, I fished, went wherever I wanted to in my car without any difficulty." He had no trouble reading and was not off work for injury or illness. He had worn glasses for nearsightedness for about 25 years. At the hearing plaintiff complained of "a pressure in my head * * * I'm in fear, if my wife leaves me I can't stand it; she stays with me constantly * * * I have the feeling I'm going to drop or black out, I don't never completely black out, at times I have to stand there and wait until the drunkenness leaves, I feel off-balanced * * * I can't stand noise, excitement whatsoever * * * I can't even stand the television." He first noticed these symptoms "within the last year and a half or two years" prior to February 26, 1963. He was nervous after his 1959 eye surgery. He was able to see out of his left eye following the accident and could see "some" with his left eye at the hearing. He experienced no difficulty in his left eye by reason of being hit by the tire. However, it worsened in "something like the last year and a half or two years, it's got a lot worse the last few months." His nervous and mental conditions became worse along with the rapid loss of vision in his left eye. Plaintiff went to Dr. James B. Allison, a specialist in neurology in

February 1962. Prior to that he saw Dr. Alex Brown, a psychiatrist, on one occasion following his last work in 1960, and he was treated by Dr. Carle H. Schroff for chronic anxiety emotional disturbance beginning June 16, 1963. Plaintiff admitted "a pre-existing disability in the right eye of eight percent." He also admitted that his employers told him he was discharged from his employment for drinking on the job.

Plaintiff's eye specialist, Dr. Stewart, first saw him February 18, 1959. "At that time he had a retina detachment of the right eye. * * * He was very nearsighted in both eyes requiring about minor 11 sphere roughly in both eyes, the best type of vision; vision in his right eye because of the detachment was limited to hand motion, the vision (distant) on that day in his left eye was 20/70 which was the best correction that we could get at that time. * * * There was some central lens ptosis present on both eyes. * * * One could definitely say that the retina detachment was caused by trauma which the patient sustained several days previously * * *. On the day of the examination being 20/70 that would be a 36% loss and at another date the best vision we ever got for Gene was 20/50 minus, that would be about 25% loss." Other left eye readings were September 1, 1959, 20/50 minus; April 16, 1960, 20/60 minus and 20/50 minus 1 upon dilation; March, 1960, 20/60 plus 1; August 16, 1960, 20/50 plus minus 1; October 5, 1960, 20/50 minus 2; April 18, 1961, 20/60; September 25, 1961, 20/70; February 23, 1963, 20/200. The last would represent 80 percent loss. Vision loss in the left eye on February 18, 1959, was caused by "the cataract changes in the center part of the eye and also the extreme myopia, the extreme myopia may not have any real bearing on the visual acuity loss because often times with that much myopia you will have 20/20 vision." Visual efficiency of the left eye on that date based on the Snellan table was 36 percent loss of distance vision and from a reading of 14/98, the near vision loss was 65 percent. He also gave readings

of 47.5 percent loss of distance acuity and as much as 86 percent near efficiency loss. Muscle function in both eyes was normal. Dr. Stewart stated that the cataract condition was the cause of deterioration in left eye vision and that if a cataract removal was performed plaintiff would have a recovery percentage of "five chances out of six of not having a detachment" which is a risk where one detachment has been sustained. He would expect a cataract operation to correct the acuity and field deficiencies in plaintiff's left eye. He found no evidence of traumatic injury to plaintiff's left eye and rendered no treatment for it except to change plaintiff's glasses.

"Q. Now, the loss of vision of the left eye * * * after your examination of February 18th resulted from a worsening of the cataract condition, is that correct? A. Yes, as far as we can tell that's about the only cause as brought about.

"Q. Now, that worsening of the cataract condition would (was) not speed it (speeded) up nor aggravated in any way by any alleged accident on February 11th, 1959, to your knowledge, was it, Doctor? A. No, I couldn't say—I can't answer that question really because a traumatic blow to the head might aggravate the cataract condition. On the other hand, as we followed Gene over a period of a year or so you see as we look over those visual acuity reports we have given you there does not seem to be any particular worsening condition at that time, so, if it was worsened by the blow, it probably was not of a great degree.

"Q. You found no evidence over that period of time that it was worsened by the blow, did you Doctor? A. There was nothing in the examination I made of Gene that made me feel that it was worsened by the blow."

On his Form 9A report Dr. Stewart stated that the right eye was injured and that the other or left eye was not. Although advised by Dr. Stewart to have his left eye operated for cataract, plaintiff has not had

the operation. "I'd say I'd certainly want it, I would take the risk, in other words * * *."

Dr. Allison first saw plaintiff in October, 1961, for a Social Security examination. He also administered psychotherapy on thirteen occasions between February and May, 1962. He first classified plaintiff as a severe anxiety reaction and later felt he was in the state of psychotic depression. He treated plaintiff with tranquillizers and antidepressant medications. He did not respond well, his condition worsened, and he was unemployable during the period of treatment by Dr. Allison. Based on history given by plaintiff, it was his opinion that plaintiff's psychiatric condition was "precipitated by the accident that he sustained." In addition he felt that the decrease in vision in plaintiff's left eye, loss of vision in his right eye, fear of loss of vision of the left eye, and the loss of job were all factors in plaintiff's psychiatric condition. The doctor thought that restoration of sight in the left eye by cataract operation would improve plaintiff's nervous tension but would not cure his nervousness. The permanency of plaintiff's condition was a matter of speculation; that with intensive (shock) treatment he had a fair chance for recovery but without it his chances were poor. Plaintiff had decided against such treatment. Dr. Allison attempted to establish plaintiff's emotional stability prior to February 11, 1959, but "he didn't remember or was very vague about his actions except he was always somewhat high strung and a little nervous before then."

Dr. Schroff's opinion of September 24, 1963, was that plaintiff had an emotional instability which pre-existed and was made evident by the 1959 accident; that he has been extremely nervous and restless since the accident resulting in a detached retina; that his near loss of vision has made him extremely apprehensive; that any occupation is out of the question unless his vision can be improved which must be quite distressing and depressing; that the present condition is a direct result of his injury and his prognosis would be directly proportional to his chances for self-sufficiency which, in turn, must be dependent upon his vision. Improvement in vision would decrease his anxiety.

According to plaintiff's wife, Melva Wilhite, prior to the accident "he was in perfect health you might say," and had no nervous or mental condition. Nina Moore and Alice McFarland testified similarly; and plaintiff's earnings in the year preceding his accident were stipulated at $3,866.95.

■ As previously indicated, the award of the Referee was modified by the Industrial Commission and the Circuit Court made findings contrary to the Final Award of the Commission. Nevertheless, it is the Award of the Commission that is reviewed in the appellate court, Patane v. Stix, Baer and Fuller, Mo.App., 326 S.W.2d 402, 411 [1].

The Industrial Commission entered its Final Award November 17, 1964, "affirming on review the award of the referee * * * as modified." It found as a result of the accident on February 11, 1959, that plaintiff sustained injury to his right eye, the exact nature of which was "92% permanent partial disability of the sight of the right eye" for which he was entitled to 128.8 weeks of compensation at $37.50 per week, 16 weeks of compensation at $37.50 per week for healing period, and $200 for facial disfigurement, a total of $5,630, against which the employer and insurer were entitled to a credit of $5,630 in full satisfaction of the Award. By way of additional findings of fact and conclusions of law the Commission further found:

"In an eye examination following the accident it was discovered that the employee had a pre-existing cataract in the left eye. We note that this condition was not particularly disabling at that time and he continued working at his regular job for some nine or ten months subsequent to his hospitalization following the accident. At that time he was discharged from his employ-

ment for reasons having no bearing on the matter here under consideration. Some year and a half before the hearing (which was commenced on February 26, 1963) the claimant lost the vision in the left eye as a result of the progression of the cataract. We think it may reasonably be said that he is now permanently and totally disabled from his bilateral vision loss. This raises the question of whether a 'condition' which exists at the time of the occurrence of an accident which subsequently blossoms or blooms into a 'disability' is chargeable to the second injury fund when the finally combined disabilities are greater than that which would have resulted from the accidental injury, considered alone and of itself. We think not. Section 287.220, RS Mo 1959 [V.A.M.S.], in referring to total and permanent disability cases involving the second injury fund speaks of the 'previous disability or disabilities'. This is quite different from saying the 'previous condition or conditions'. We cannot believe that the legislative use of the terms 'disability or disabilities' was accidental. The evidence wholly fails to prove that the disability resulting from the accidental injury to the right eye combined at that time with a then existing disability to the left eye which rendered the employee then and there permanently and totally disabled. We are unable to see any legislative intent authorizing us to tack subsequent disabilities at the expense of the second injury fund. We rule the contention against the employee.

"The employee is a nervous, high strung person, inferentially, by temperament. He was first seen by a neurologist-psychologist in October, 1961 when he was diagnosed as having an anxiety reaction neurosis. Subsequently, this was diagnosed as psychotic depression. The doctor's testimony indicated that any one of a number of factors could have been the triggering mechanism in causing this condition. We find and believe that the employee has failed to prove that this condition was caused, precipitated or aggravated by the accident of February 11, 1959. The facts here bear considerable analogy to those in Patane vs. Stix, Bear & Fuller, 326 SW 2d 402."

■ Neither the circuit court nor the appellate courts may substitute their judgment for such a Final Award if, upon consideration of the whole record, including legitimate inferences, in the light most favorable to the award, the findings of the Commission are supported by substantial and competent evidence and are not contrary to the overwhelming weight of the evidence. Snowbarger v. M. F. A. Central Co-op., Mo., 349 S.W.2d 224, 225 [2]; Ginter v. Freund Baking Co., Mo.App., 388 S.W.2d 505, 507 [1, 2]; Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W. 2d 136, 141 [6, 7].

Under this rule the previously stated evidence provides ample support for the Commission's Award.

Plaintiff contends first that the uncontradicted evidence requires a finding that the accident resulted in a total loss of vision to his right eye and that previous disability to his eyes combined with the injury to result in total permanent disability. Plaintiff's position is based primarily on mathematical computations which make use of Dr. Stewart's percentages of sight deficiencies due to myopia and left eye cataract to show that plaintiff had less than 20/20 or full vision in his eyes prior to the accident, and thus to show previous disability to plaintiff's eyes.

■■ "Previous disability to his eyes," however, is not what is involved. The pre-existing permanent partial disability necessary to compensation from the Second Injury Fund under Section 287.220, V.A. M.S., relates to disability to work and means "industrial disability" or loss of earning capacity, rather than physical impairment as such. Diederich v. Tri-City Ry., 219 Iowa 587, 258 N.W. 899, 902 [2]; 99 C.J.S. Workmen's Compensation § 296, p. 1035. Consequently, even though the Commission might have been justified in

making findings other than those it did make, it did not do so, and the evidence, irrespective of conflict and contradiction, that plaintiff was able to work, read, fish, drive, and "was in perfect health" prior to the accident, and that he worked without difficulty at the same job as before his injury for nine months following his injury, operations and healing period layoff; that the sight in his left eye was retained until clouded by cataract quite some time after discharge from his employment, and that an operation would likely restore its sight; that there was some sight in the right eye even though limited to light and hand motion, constituted competent and substantial evidence to support the commission in finding permanent partial disability in the sight of one eye rather than total loss of the right eye, or industrial blindness of both eyes and pre-existing disability in respect to either or both of plaintiff's eyes, necessary to Second Injury Fund consideration under Section 287.220, V.A.M.S.

Plaintiff contends also that the finding that he failed to prove that his psychotic depression was caused, precipitated or aggravated by the accident in question was not supported by competent and substantial evidence and is clearly contrary to the overwhelming weight of the evidence.

■ Mental conditions are, of course, compensable under Missouri's Workmen's Compensation Law provided they are shown to have been directly and proximately caused by the accident. Cebak v. John Nooter Boiler Works Co., Mo.App., 258 S.W.2d 262, 265 [4]. Plaintiff argues that "it is uncontradicted, undisputed and unquestionable that plaintiff-appellant was, and is, totally and permanently disabled from a mental condition—psychotic depression," and this could be the case if plaintiff continues without treatment in view of the diagnoses and prognoses of Doctors Allison and Schroff. However, proof of the condition is not proof of causation.

Plaintiff points to the opinion of Dr. Allison that plaintiff's psychiatric condition was precipitated by the accident, and to the opinion of Dr. Schroff that plaintiff's chronic anxiety emotional disturbance was a direct result of the injury. He then cautions that even though the Commission be vested with the right to pass upon credibility of witnesses, it may not arbitrarily disregard and ignore competent, substantial and undisputed evidence of witnesses not shown to have been impeached. Corp v. Joplin Cement Co., Mo., 337 S.W.2d 252, 258 [5–7].

Again, upon the record in this case, the Commission might well have made the finding suggested by plaintiff. However, a review of the previously stated testimony of Doctors Allison and Schroff in its entirety together with other evidence in this case supports the Commission rather than to show an arbitrary disregard of the evidence.

■ According to Dr. Allison, the permanency of plaintiff's mental condition was a matter of speculation and he had a fairly good chance of recovery if he took shock treatment which, at the time of the hearing, he was refusing. Dr. Allison also thought that an operation for repair of plaintiff's cataract would help the nervous condition. Similarly, Dr. Schroff testified that improvement in plaintiff's vision would bring about a decrease in his anxiety, and Dr. Stewart felt the chances to be five out of six for the success of a cataract operation. Such evidence is inconsistent with the alleged permanency of a mental condition.

In respect to causation, Dr. Allison, although stating that the plaintiff's psychiatric condition was precipitated by the accident, also stated that plaintiff "always was somewhat slightly nervous"; that in trying to establish whether he was emotionally stable prior to the accident, plaintiff "didn't remember or was very vague about his actions except he was always somewhat high strung and a little nervous before the accident." Plaintiff told him he had had previous minor symptoms of

anxiety. He diluted his opinon on causation further by recognizing that decrease in vision in plaintiff's left eye, loss of vision in his right eye, fear of loss of vision in his left eye, and loss of his job were also factors to be taken into account in plaintiff's psychiatric condition. Dr. Schroff in his attempt to relate the psychiatric condition to the injury recognized that plaintiff's emotional instability probably existed before the accident. The opinions of Doctors Allison and Schroff were based in part necessarily on history and complaints related to them long after the accident. Plaintiff had no psychiatric treatment prior to October, 1961, and he disputed any pre-existing mental condition by his testimony that he first noticed symptoms within the year and a half to two years prior to February 26, 1963, a time when his cataract condition was rapidly deteriorating. It was then that he thought he was "going to pieces." His ability to do his work for nine months following his operations and convalescence contradicts a disabling mental condition at that time. Further, contradiction of mental illness prior to the accident was furnished by Mrs. Wilhite in her assurance that "he was in perfect health you might say."

As suggested by the Commission, Patane v. Stix, Baer and Fuller, supra, is in point. Plaintiff there sustained an injury in the nature of a blow on the head from a falling counter top. She was subsequently discharged for substandard performance not related to her injury. She, too, claimed a psychoneurotic condition, but the Commission, despite medical testimony to the contrary, was affirmed in its finding that any such mental condition was not caused, precipitated, or aggravated by the accident and that her discharge was the precipitating factor.

The evidence reviewed here constituted competent and substantial evidence to support the Commission in its second finding of a failure to prove a psychiatric condition caused by the injury as well as the finding on permanent partial disability. And on such evidence it cannot be said that there was no dispute, conflict or contradiction by which to charge the Commission with arbitrary disregard of evidence.

Points briefed by the State Treasurer and the employer and insurer respecting the statute of limitations and waiver need not be discussed because the Commission's Final Award which made no award against the Second Injury Fund is to be affirmed, as is the 128.8 weeks of compensation awarded against the employer and insurer which they say in their brief should be affirmed.

The judgment of the trial court is affirmed in part and reversed insofar as it conflicts with the findings of the Industrial Commission, and the cause is remanded with direction to reinstate the Final Award made by the Industrial Commission.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., and HENLEY, J., concur.

SEILER, J., not sitting.