Ernest R. WUEBBELING,
Employee/Respondent,

v.

WEST COUNTY DRYWALL,
Employer/Appellant,

and

Treasurer of the State of Missouri, as
custodian of the Second Injury
Fund, Respondent.

No. 65338.

Missouri Court of Appeals,
Eastern District,
Division One.

March 7, 1995.

Motions for Rehearing and/or Transfer to
Supreme Court Denied May 2, 1995.

Application to Transfer Denied
June 20, 1995.

Daniel J. Harlan, St. Louis, for appellant.

James W. McCarthy, St. Louis, for employee/respondent.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cynthia A. Quetsch, Asst. Atty. Gen., for Second Injury Fund.

CRAHAN, Judge.

West County Drywall ("Employer") appeals an award by the Labor and Industrial Relations Commission ("Commission") modifying the decision of the Administrative Law Judge ("ALJ") and holding that total disability payments awarded to its employee Ernest R. Wuebbeling ("Claimant") are the sole responsibility of the Employer and not the Second Injury Fund. The ALJ found that

Claimant had sustained 50% permanent partial disability as a result of the accident which, combined with prior injuries, rendered Claimant completely disabled. The ALJ held Employer liable for the 50% permanent partial disability and the Second Injury Fund liable for the balance. The Commission adopted the ALJ's findings except as to the liability of the Second Injury Fund, holding that the prior injuries were not "industrially disabling." Based on this determination, the Commission modified the award to hold Employer liable for permanent and total disability. We reverse the award and remand for reconsideration in light of the new standard embodied in the 1993 amendments to § 287.220.1 RSMo 1994, which were held applicable to all pending cases in *Leutzinger v. Treasurer of Missouri*, 895 S.W.2d 591 (Mo.App.E.D.1995).

Claimant began working for Employer as a drywall hanger in 1981. On June 23, 1987, Claimant was working approximately fifteen feet off the ground hanging a piece of drywall when the scaffolding he was standing on collapsed. Claimant fell and landed initially on his feet before collapsing on his back. He was taken by ambulance to St. John's Mercy Medical Center where x-rays revealed 20% to 30% wedge fractures at T12 and L1. He was later transferred to DePaul Hospital and placed in traction. A CT scan taken three days later revealed a fracture line in the body of L1. Dr. William Hoffman, who had previously performed a microsurgical discectomy on Claimant in October of 1986 due to a ruptured lumbar disc, assumed care of Claimant and diagnosed multiple thoracolumbar compression fractures. Claimant spent nine days in the hospital recuperating from this injury.

Following his release, Claimant returned to Dr. Hoffman in July, September and October of 1987 for follow-up care and treatment. On each of these visits, Claimant continued to complain of pain in his back. At Dr. Hoffman's recommendation, Claimant attended a work hardening program at Christian Northeast Hospital. Upon completion of this program, he was released to return to work in late October of 1987, despite continued complaints of pain in his back and shoulder.

Claimant worked at West County Drywall until April of 1989. Although Claimant sought no medical treatment at that time, he concluded that the pain was so severe that he could no longer adequately perform his work.

One year later, in April of 1990, Claimant returned to see Dr. Hoffman. Dr. Hoffman ordered a new MRI which, in addition to revealing the previous wedge compression fractures at T12 and L1, also revealed advanced degenerative changes and mild retrolisthesis of L5 and S1, as well as scar formation. Although Dr. Hoffman again released Claimant to return to work, he acknowledged that Claimant might not be able to perform his former work because of his back pain. Claimant did not return to work for Employer. However, Claimant was videotaped installing a roof with his brother-in-law in December of 1990 and doing many of the same activities he had complained that he could no longer perform.

Claimant filed his initial claim for compensation as a result of the June 1987 accident on May 10, 1989. Subsequently, in an amended claim filed on June 15, 1990, Claimant sought compensation from the Second Injury Fund alleging pre-existing injuries to his right shoulder, right ankle, and low back. A hearing was held and evidence adduced. It was established that on March 13, 1990, Claimant was seen by Dr. Ralph J. Graff for the purpose of a workers' compensation evaluation at the request of Employer. Dr. Graff concluded Claimant sustained a 17.5% permanent partial disability of the man as a whole as a result of the June 23, 1987 injury.

Claimant was also evaluated on October 16, 1990 by Dr. Thomas Musich. Dr. Musich concluded that Claimant suffered multiple thoracolumbar compression fractures referable to his June 23, 1987 injury resulting in a 60% permanent partial disability of his thoracolumbar spine. Additionally, Dr. Musich was requested to give disability ratings for all of Claimant's alleged pre-existing injuries. Dr. Musich was of the opinion that Claimant suffered a 35% disability of the man as a whole as a result of the 1986 injury which led to the previous disc surgery by Dr. Hoffman. He also determined that as a result of a prior motorcycle accident, Claimant sustained a

chronic shoulder contusion and shoulder strain syndrome on the right shoulder which resulted in a permanent partial disability rating of 20% of the right shoulder. Additionally, he determined that Claimant sustained a 20% permanent partial disability in the right lower ankle as a result of numerous sprains. Dr. Musich concluded that the summation of all of these injuries and the resulting disabilities rendered Claimant permanently and totally disabled.

James England, an employment rehabilitation counselor, also evaluated Claimant on June 19, 1991. He concluded that while Claimant might be able to work two or three days a week, he would not be able to sustain regular employment and compete in the open labor market even in a sedentary work capacity because of pain which often required him to lie down for relief.

The ALJ issued his award on May 21, 1992. He found that Claimant sustained a 50% permanent partial disability to the body as a whole as a result of multiple thoracolumbar compression fractures suffered in the June 1987 accident for which Employer was liable. The ALJ also found Claimant to be permanently and totally disabled due to the combination of the June 1987 injuries and his prior injuries. Liability for the permanent and total disability was assessed against the Second Injury Fund. The Employer and the Second Injury Fund applied for review by the Commission.

The Commission concluded that Claimant cannot compete in the open labor market given his total situation and condition, and found in accordance with the ALJ that Claimant was permanently and totally disabled. However, the Commission found that there were no pre-existing "industrial disabilities," and thus, reversed the award against the Second Injury Fund. The Commission further concluded that permanent total disability was the sole responsibility of the Employer. Employer appeals the Commission's decision.

Our original opinion in this case addressed Employer's contentions on appeal in the context of § 287.220.1 RSMo Cum.Supp.1992, the statutory language in effect prior to the comprehensive amendments enacted in 1993, which became effective in August, 1993. *See* § 287.220.1 RSMo 1994. On the court's own motion, that opinion was withdrawn so that we could consider whether this case, along with others pending before the same panel, might be an appropriate vehicle for transfer to the Missouri Supreme Court for reexamination of the existing case law as to what constitutes an "industrial disability" for purposes of Second Injury Fund liability.

■ As noted in *Leutzinger,* the term "industrial disability" was never part of the statutory language of § 287.220.1. Rather, the term was judicially created in an attempt to restrict the liability of the Second Injury Fund to the circumstances and purposes for which it was created. The acknowledged purpose of the Second Injury Fund was to encourage employment of disabled workers by reducing the liability of their employers. *Meilves v. Morris,* 422 S.W.2d 335, 338 (Mo. 1968).[1] In effect, the Second Injury Fund removes the *incentive* to discriminate against disabled workers by offering assurance to employers that if the prior disability combines with a later, on-the-job injury so as to

---

1. The history and purpose of the Second Injury Fund was explained in detail in R. Cohn, History of Workmen's Compensation Law, 15 Mo.Ann. Stat. 17, 27 (Vernon 1965):

The manpower shortage created by World War II, the use of handicapped persons in industry, the return of disabled war veterans brought about an awakening to the social aspect of the compensation law. Many persons with pre-existing disabilities in war and civilian jobs clearly indicated that they could fill the labor market without exposure to further injury and cost to industry. As a result of the combined effort of all veterans' organizations, labor organizations, industrial groups and Bar associations, this highly important amendment was passed. Prior to this, many handicapped persons were refused employment. Upon establishment of the second injury fund, many handicapped people could be employed without any greater potential risk or cost to their employers.

*See also* J. Slusher, *The Second Injury Fund,* 26 Mo.L.Rev. 328 (1961) (Fund serves to encourage the hiring of individuals who are already disabled to an extent which might render them susceptible to further injury).

produce permanent and total disability [2] that would not have resulted in the absence of the prior disability or condition, the employer's liability will be no greater than it would have been if the employee had been a perfectly healthy, non-disabled worker. The balance of the compensation for the employee's permanent and total disability is provided by the Second Injury Fund, which in effect spreads the risk attendant to the employers of disabled workers among all insurance carriers contributing to the Fund.

In his comprehensive treatise on worker's compensation, Professor Larson discusses the classic paradigm of Second Injury Fund liability involving a worker blind in one eye. *See* 2 Arthur Larson, The Law of Workmen's Compensation § 59.31(a) (1994). In many occupations, blindness in one eye would not, in and of itself, make the work more dangerous or prevent a worker from performing his duties as well as any worker with unimpaired eyesight. As Professor Larson points out, however, the compensation insurance premium would be substantially greater for the worker blind in one eye because a work related accident resulting in loss of the other eye would likely result in permanent and total disability as contrasted with the scheduled disability payments for loss of one eye if the same accident had happened to a worker with no prior visual impairment. *Id.* Thus, despite the fact that the worker blind in one eye is equally capable of performing the work, in the absence of a Second Injury Fund an employer would have a strong incentive either to withhold employment or, if the condition resulted from non-work related causes during employment, to terminate employment in order to save on compensation insurance premiums.

In the instant case, the Commission overruled the ALJ and found no liability on the part of the Second Injury Fund based on its determination that the prior back injury had not, prior to the present injury, caused the claimant to miss any significant amount of work or prevented him from performing any of his usual and customary duties as a dry-wall hanger. Substantial support for the Commission's analysis is found in *Shipp v. National Vendors*, 862 S.W.2d 344 (Mo.App. 1993), and an extensive collection of cases discussed therein, which the court summarized as follows:

> In defining the term "industrial disability" the courts have focused on whether the pre-existing condition caused the claimant to miss a considerable amount of work; made claimant's work dangerous; prevented claimant from performing his previous duties; or resulted in claimant working less or only working part-time.

*Shipp*, 862 S.W.2d at 346. Although each of these factors might well be of evidentiary value in establishing that an employee did, in fact, suffer from a prior disability, we question whether any or all of these criteria can properly be viewed as the exclusive means of determining the liability of the Second Injury Fund.

As observed above, a worker sightless in one eye might well work full-time and perform his work as well as a worker with normal vision. Such a condition would not necessarily cause the worker to miss a considerable amount of work or, in many occupations, make the work more dangerous to the employee or others. Yet, the employer would have just as strong an incentive to discriminate against such a worker as it would against a worker whose condition did make the work more dangerous or caused the employee to work part-time or miss a considerable amount of work. This incentive derives from the potential that a previously manifest condition not otherwise "disabling" in the classic sense could reasonably be expected to combine with a subsequent injury to produce a substantially greater disability than would have occurred but for the prior condition. Inasmuch as none of the criteria discussed in *Shipp* or the cases cited therein address this incentive, we question whether those criteria, insofar as they have been viewed as the exclusive or comprehensive test of Fund liability, can be reconciled with

2.  Conceptually similar but mechanically different provisions govern prior disabilities and subsequent injuries which combine to produce permanent partial disabilities. *See Searcy v. McDonnell Douglas Aircraft Co.,* 894 S.W.2d 173 (Mo.App. E.D.1995).

the legislative intent which led to establishment of the Fund in the first place.

The criteria for industrial disability discussed in *Shipp* and the numerous cases discussed therein are expressly acknowledged in most of the cases to have been derived from the Missouri Supreme Court's opinion in *Wilhite v. Hurd*, 411 S.W.2d 72 (Mo.1967). A closer reading of *Wilhite*, however, reveals that the concept of "industrial disability" first articulated in that case concerned an entirely different context than that to which it has subsequently been applied.

In *Wilhite*, the claimant was involved in an industrial accident in which he was blinded in his right eye. An examination of the claimant shortly after the accident revealed that the claimant also had a pre-existing cataract in the left eye, but the condition was not then considered disabling. 411 S.W.2d at 75. After a healing period, the claimant returned to work where he had no trouble doing the same work he had done before the accident and was able to resume driving and reading. 411 S.W.2d at 74. About nine months later, the claimant was discharged for causes unrelated to his injury. *Id.* Approximately two years after the injury, the claimant lost the vision in his left eye due to progression of the cataract, which the evidence indicated was unrelated to the trauma to the right eye. At the hearing, the claimant sought compensation for permanent and total disability as a result of his near blindness in both eyes.

The Commission held that the claimant was permanently and totally disabled, held employer responsible for an agreed rating of 92% loss of the right eye resulting from the accident, and denied liability for permanent and total disability against the Fund. The Commission held that the evidence failed to prove that the disability resulting from the accidental injury to the right eye combined *at that time* with a *then existing disability* to the left eye to render the employee *then and there* permanently and totally disabled. 411 S.W.2d at 77. Holding that subsequent disabilities could not be tacked on at the expense of the Second Injury Fund, the Commission limited the claimant's recovery to the amount assessed against the employer for the injury to the right eye.

On appeal, the Missouri Supreme Court affirmed, observing in an oft-quoted passage that "[t]he pre-existing permanent partial disability necessary to compensation from the Second Injury Fund under Section 287.220, V.A.M.S., relates to disability to work and means 'industrial disability' or loss of earning capacity, rather than physical impairment as such." 411 S.W.2d at 77 (citing *Diederich v. Tri–City Ry.*, 219 Iowa 587, 258 N.W. 899, 902[2] ). In the context of the Commission's holding, however, it is apparent that the focus of the Court's inquiry, as well as the Commission's, was on whether the established prior cataract condition was, *either prior to or at the time of the injury to the right eye*, "industrially disabling." If not, it obviously could not then combine with the second injury to the right eye to render the employee permanently and totally disabled at the time of the second (right eye) injury. In view of the evidence that the employee was able to perform his job satisfactorily following the injury to the right eye, the Court held that the Commission's award was supported by substantial evidence.

So interpreted, *Wilhite* is fully consistent with the acknowledged purpose of the Second Injury Fund because the alleged prior disability, the cataract in the left eye, did not at the time of the compensable injury to the right eye, combine with that injury so as to render the claimant permanently and totally disabled. Because the claimant was able to return to work and perform all of his duties satisfactorily after the compensable injury, the alleged prior disability clearly had no effect on the claimant's earning power and was not in any sense "industrially disabling." Although the cataract condition did later by natural progression cause blindness in the left eye rendering the claimant permanently and totally disabled, the Fund could not be held liable for such disability because, when the disability occurred, it was not the result of a compensable injury.

Although *Wilhite* is consistent with the acknowledged purpose of the Second Injury Fund, cases applying its definition of "industrial disability" are not. In *Meilves v. Morris*, 422 S.W.2d 335 (Mo.1968), for example, the Missouri Supreme Court accepted the

parties' interpretation of *Wilhite* as holding that the prior disability which triggers Second Injury Fund liability must be shown to have been "industrially disabling" *prior* to the injury which gives rise to the claim.[3] *Id.* at 337–38. As discussed above, this was not the focus or the holding in *Wilhite*. Nor is such a requirement consistent with the underlying purpose of the statute.

■ The Second Injury Fund statute recognizes that employers have a financial incentive to discriminate against individuals who have a condition which renders them more susceptible to a greater degree of disability compared to workers who have no such condition. That incentive to discriminate is precisely the same whether the condition has previously caused the employee to miss work or not. Many occupations can be ably performed by workers with one eye or one arm. In such cases, the condition may not cause the employee to miss any work or otherwise diminish his earning power. The condition becomes disabling only when combined with a further injury. It is the potential for those more serious combinations of injury and previous condition that gives rise to the employer's incentive to discriminate in the absence of a Second Injury Fund. Thus, a requirement that the condition be shown to have caused the employee to have missed work or suffer diminished earnings *prior* to the injury which combines with the condition to render the employee disabled is inconsistent with the purpose of the Fund. In many instances, the effect would be to deny the protection of the Fund to those most in need of it.

■ If the Second Injury Fund is to fulfill its acknowledged purpose, the proper focus of the inquiry as to the nature of the prior disability is not on the extent to which the condition has caused difficulty in the past; it is on the *potential* that the condition may combine with a work related injury in the future so as to cause a greater degree of disability than would have resulted in the absence of the condition. That potential is what gives rise to prospective employers' incentive to discriminate. Thus, if the Second Injury Fund is to serve its acknowledged purpose, "previous disability" should be interpreted to mean a previously existing condition that a cautious employer could reasonably perceive as having the potential to combine with a work related injury so as to produce a greater degree of disability than would occur in the absence of such condition.[4] A condition satisfying this standard would, in the absence of a Second Injury Fund, constitute a hindrance or obstacle to employment or reemployment if the employee became unemployed.

We are, of course, bound by *Meilves* and the numerous decisions of this court that have followed it. However, because neither *Meilves* nor any of our cases have considered whether the requirement that the prior condition be shown to be industrially disabling prior to the accident giving rise to the claim is consistent with the acknowledged purpose of the Second Injury Fund, we initially concluded that this case and others should be transferred to the Missouri Supreme Court for reexamination of the law. While our opinions supporting such transfer were being prepared, however, the issue appears to have been mooted by this court's intervening decision in *Leutzinger*.

■ In *Leutzinger*, the court pointed out that the judicially created concept of "industrial disability" has been superceded by the 1993 amendments to § 287.220.1. *See Leutzinger*, 895 S.W.2d at 594. In its place, the legislature has defined the nature of the preexisting disability which will give rise to Second Injury Fund liability—*i.e.*, "a preexisting permanent partial disability whether from compensable injury or otherwise, of such ser-

3. *Meilves* ultimately remanded the claim to the Commission to permit submission of additional evidence of industrial disability. 422 S.W.2d at 339.

4. The term "disability" has been similarly so construed in the context of the Longshoremen's Act. *See, e.g., C & P Tel. Co. v. Dir., Office of Wkrs.' Comp. Prog.*, 564 F.2d 503, 513 (D.C.Cir. 1977), where the court held the term sufficiently broad to encompass cases wherein an "employee had such a serious physical disability in fact that a cautious employer would have been motivated to discharge the handicapped employee because of a greatly increased risk of employment-related accident and compensation liability."

iousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed ..." § 287.220.1 RSMo 1994.[5] *Leutzinger* further holds that such amendment to a remedial statute such as the Second Injury Fund law should be applied retroactively to pending cases. The Commission's award in this case was issued on December 28, 1993, which was after the effective date of the amendments.

We agree with the holding in *Leutzinger* and conclude that this award should be vacated and remanded to the Commission for further consideration under the standard set forth in § 287.220.1 RSMo 1994. Because it is unlikely that there are now any pending Second Injury Fund cases that were decided prior to the effective date of the amendments, it does not appear that transfer to the Missouri Supreme Court for reexamination of the former "industrially disabling" standard would serve any useful purpose. We note, however, that our analysis of the issue as set forth above suggests that the 1993 amendments to § 287.220.1 pertaining to permanent total disability do not necessarily represent a significant change, if any change, to the concept and intent embodied in the statute as originally enacted. Had the Missouri Supreme Court accepted transfer and adopted our interpretation of the earlier statute, such a change would also have applied retroactively and would have resulted in a standard fully compatible with, if not identical to, that set forth in the amendments.

Accordingly, we reverse the Commission's award and remand the cause to the Commission for reconsideration pursuant to the statutory standards set forth in § 287.220.1 RSMo 1994.

REINHARD, P.J., and KAROHL, J., concur.

---

**5.** The statute also sets forth additional threshold tests that must be satisfied as a prerequisite to Fund liability where the pre-existing disability and subsequent injury combine to produce permanent partial disability.