Mammie SMITH, Appellant–Respondent,

v.

CONAGRA, INC., Respondent–Appellant,

State of Missouri, Second Injury Fund, Respondent.

Nos. WD 53261, WD 53372.

Missouri Court of Appeals, Western District.

Aug. 5, 1997.

John B. Boyd, Michelle Daum Haskins, Connaughton, Boyd & Kenter, P.C., Kansas City, for Appellant–Respondent Smith.

William A. Peterson, Marshall, for Respondent–Appellant ConAgra.

Jeremiah W. (Jay) Nixon, Attorney General, Theodore A. Kardis, Assistant Attorney General, Jefferson City, for Respondent Second Injury Fund.

Before LAURA DENVIR STITH, P.J., and BRECKENRIDGE and HANNA, JJ.

LAURA DENVIR STITH, Presiding Judge.

Claimant Mammie Smith appeals the Labor and Industrial Relations Commission's ruling denying her claim against the Second Injury Fund for permanent total disability benefits. Ms. Smith contends that: (1) the evidence does not support the Commission's finding that she was not permanently and totally disabled, and (2) the Commission erred in ruling that her morbid obesity was not a preexisting disability and that it did not constitute a hindrance or obstacle to employment. Ms. Smith's employer, ConAgra, Inc., has filed a cross-appeal alleging that the Commission erred in finding Ms. Smith 30% permanently partially disabled based on injuries arising out of a fall at ConAgra because this rating is not supported by the evidence and is against the overall weight of the evidence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mammie Smith is in her fifties. She began working for ConAgra in February, 1967 as a poultry processor. She worked for ConAgra for most of her working life, with her only other employers being a hospital and a nursing home. Over the course of her twenty years with ConAgra, she was promoted to the position of "lead processor," a position that entailed additional responsibilities such as setting up the production line, filling in for employees on break, training new employees, and keeping production records.

Ms. Smith has a severe weight problem. She is 5'3" tall and, as she testified, has "been big all [her] life." She testified that when she started working for ConAgra in 1967 she weighed 187 pounds, but that since 1985 she has weighed at least 240 pounds. At one point in August 1994 she weighed 287 pounds. She carries between two-thirds and three-fourths of her weight from the waist down.

Between 1984 and 1986 Ms. Smith sustained several workplace injuries. In 1984 she had surgery to treat carpal tunnel syndrome in her left hand. For that injury she received workers' compensation in a settlement based on a 10% permanent partial disability at the 200 week level. In 1985 she injured her right knee and back and received compensation in a settlement agreement based on an 11% permanent partial disability as a whole. In 1986 she was treated for carpal tunnel syndrome in her right hand and received compensation in a settlement based on a 10% permanent partial disability at the 200 week level.

On June 1, 1987, Ms. Smith slipped on a loose apron string at work and fell, injuring her neck, back, left shoulder, and knees. She was referred to Dr. Darrel Fenton, an orthopedic surgeon, for treatment. Dr. Fenton examined Ms. Smith on several occasions. He first examined her on July 9, 1987, approximately a month after she fell. X-rays and neurological examinations found no problems, but Dr. Fenton diagnosed Ms. Smith with several soft tissue injuries to her shoulders, legs, and back, as well as morbid exogenous obesity. Dr. Fenton met with Ms.

Smith again on September 10, 1987, to hear her complaints that her feet were falling asleep while she sat or stood for prolonged periods. He reported that her condition had not changed since her earlier visit. He stated that it was his medical opinion that her injuries were complicated by her obesity. Ms. Smith tried to lose weight while Dr. Fenton was treating her, and did lose twenty pounds at one point during his treatment, but did not keep the weight off.

Dr. Fenton saw Ms. Smith again on March 1, 1988, because of persistent complaints. He determined that she suffered from some degenerative disk disease. He started her on a physical therapy program to help strengthen her lower back and legs, but Ms. Smith could not tolerate the physical therapy program and did not make any progress. A subsequent examination led to the discovery of a lipoma on Ms. Smith's left shoulder that was surgically removed. In September 1988, Dr. Fenton took X-rays of Ms. Smith's right knee. He found "significant degenerative arthritic changes to the knee of prolonged standing," medial osteophyte formation, and loss of joint space. He believed that arthroscopic surgery would provide, at best, only short term relief because of Ms. Smith's morbid obesity and her inability to strengthen her leg.

On October 31, 1988, Dr. Fenton wrote ConAgra, stating his opinion that Ms. Smith would be "medically at risk" if she returned to work for them. He stated that Ms. Smith had sustained permanent partial disabilities to her body totalling 19%, primarily to her right knee. He believed that her obesity hampered her recovery from her injuries, stating:

> I have respectfully stated to Ms. Smith that a body build is not particularly a preclusion to an occupation, nor is it a particular problem at times until such injuries may occur. However mild an injury may be, at that time, a body habitus may contribute significantly to its recovery and I feel that this is presently the case. In regards to further employment, I feel that a sedentary activity that allows flexibility of movement as she may need would be required. Infrequent lifting or carrying of approximately 10–15 lbs. may be handled if she should tolerate this. I would not recommend lifting from a floor level. I would consider more from a waist level in regards to safety. A vocational evaluation and rehabilitation may be necessary for her.

On August 3, 1987, Ms. Smith filed a claim for compensation with the Department of Labor and Industrial Relations of Missouri based on her June 1, 1987 injuries and the later complications. She requested medical care, payment for temporary total disabilities, and payment from the Second Injury Fund because of her preexisting permanent partial disabilities. At a hearing on Ms. Smith's claim on September 13, 1994, the ALJ found Ms. Smith permanently and totally disabled because of the combined effects of her multiple disabilities and awarded her compensation from the Second Injury Fund. He also found that Ms. Smith sustained a 30% permanent partial disability to the body as a whole as a result of the accident.

Both ConAgra and the Custodian of the Second Injury Fund appealed the ALJ's ruling to the Labor and Industrial Relations Commission. The Commission affirmed the ALJ's finding of a 30% permanent partial disability against ConAgra based on the accident. It did not find, however, that the evidence supported Ms. Smith's claim that she suffers from a permanent total disability as a result of the combination of her primary and alleged preexisting disabilities. It, therefore, reversed the ALJ's award of permanent total disability benefits against the Second Injury Fund. One of the Commissioners dissented, arguing that Ms. Smith is eligible for Second Injury Fund compensation because her morbid obesity is a preexisting permanent partial disability and a hindrance or obstacle to her employment which, when combined with her primary injury, made her permanently and totally disabled.

Ms. Smith appeals the Commission's determination that she is not permanently and totally disabled or entitled to benefits for such disability. ConAgra cross-appeals the Commission's award of 30% permanent partial disability.

## II. SCOPE OF REVIEW

■ Appellate review in workers' compensation cases is limited. We review the decision of the Labor and Industrial Relations Commission. We do not substitute our judgment for that of the Commission and can reverse, remand, or modify only if the Commission acted in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence to support the award. § 287.495, RSMo 1994; *see Johnson v. Denton Constr. Co.*, 911 S.W.2d 286, 288 (Mo. banc 1995); *Lumbard–Bock v. Winchell's Donut Shop*, 939 S.W.2d 456, 458 (Mo.App.1996). We deferentially review challenges to the evidence supporting the Commission's ruling:

> The reviewing court may not substitute its judgment on the evidence for that of the Commission. The weight of the evidence and the credibility of witnesses are ultimately for the Commission. The court applies a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, it takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings.

*Davis v. Research Medical Center*, 903 S.W.2d 557, 571 (Mo.App.1995).

## III. THE LABOR AND INDUSTRIAL RELATIONS COMMISSION DID NOT ERR IN NOT FINDING THE CLAIMANT "PERMANENTLY AND TOTALLY DISABLED"

### A. Parties' Contentions

Ms. Smith contends that the Commission erred in not finding that the Second Injury Fund is liable because she is "permanently and totally disabled." The Second Injury Fund is liable if "previous disability or disabilities, whether from compensable injury or otherwise, and the last injury together result in total and permanent disability." § 287.220.1, RSMo 1986. Section 287.020.7 declares that "total disability" shall mean "inability to return to *any* employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident." (emphasis added). As noted by the Court of Appeals for the Southern District in *Story v. Southern Roofing Co.*, 875 S.W.2d 228 (Mo.App. 1994), this requires a determination of whether the person is able to compete on the open job market by examining whether an employer, in the usual course of business, would reasonably be expected to employ the person in his or her present physical condition. *Id.* at 232–33 (citing *Patchin v. National Super Markets, Inc.*, 738 S.W.2d 166 (Mo.App.1987) and *Crum v. Sachs Elec.*, 769 S.W.2d 131 (Mo.App.1989)). *See Mathia v. Contract Freighters, Inc.*, 929 S.W.2d 271, 275 (Mo.App.1996) (applying the same standard).

The Second Injury Fund notes that Ms. Smith's appeal depends on a finding that her morbid obesity is a preexisting disability of such seriousness as to constitute a hindrance or obstacle to employment which, when combined with her 1987 injuries and/or her earlier injuries, renders her permanently and totally disabled. It argues that her obesity is not a disability at all, and that even if it were she failed to show it constitutes a hindrance

or obstacle to employment and that in any event she failed to show she is permanently and totally disabled even if her obesity is considered.

For the reasons set out below, we agree that Ms. Smith failed to prove that she is permanently and totally disabled as a result of her injuries and her obesity. Therefore, we affirm the Commission's decision without reaching the Fund's other arguments.

## B. Evidence of Permanent Total Disability

Ms. Smith argues that all of the medical and vocational experts that testified in the case were in agreement that she cannot work. The record shows, however, that several physicians testified that she could work. For example, Dr. Fenton, Ms. Smith's main treating physician, said in a letter to ConAgra that "I have respectfully stated to Ms. Smith that a body build is not particularly a preclusion to an occupation, nor is it a particular problem at times until such injuries may occur." After his initial examination on July 9, 1987, Dr. Fenton wrote that "[i]t is felt that the patient can continue to work." After an examination on August 13, 1987, Dr. Fenton wrote that "[i]f she can make a significant effort and demonstrate loss of weight [then] she may be capable of continuing occupation." After another examination on September 10, 1987, Dr. Fenton noted that he had "discussed with her the combination of problems that if she truly can tolerate work and is making improvement that she states that she is then she may safely be able to continue." He also recommended certain restrictions on her future jobs responsibilities in his summary report to ConAgra that was quoted above.

Dr. Browning, Dr. Fenton's partner, also examined Ms. Smith. He testified that she is better suited to a more sedentary position than her previous position as "lead processor." He also testified that much of Ms. Smith's ability to work in the future is dependent on her own desire. He noted that "[c]ertainly her motivation would be a factor in returning to work and if she is highly motivated to do so, there is no absolute physical contra-indication to that at this time."

Dr. Craig, who examined Ms. Smith on two occasions in 1988, wrote that "[p]hysical examination reveals a very obese lady in no acute distress at this time." Dr. Craig believed that "[d]iagnostically ... this lady did suffer at least a soft tissue injury of her lumbar spine and it may be somewhat slow to heal." Dr. Hermann, who saw Ms. Smith once when Dr. Fenton was unable to see her, wrote that in his opinion "since the work is what is aggravating her discomfort, that she should attempt to either change jobs or stay away from that type of activity that causes her pain."

While Dr. Folck testified that Ms. Smith's size would preclude her from some employment opportunities and make it harder for her to get a job, he noted that morbidly obese people can and do work certain types of jobs. Mr. McClellan, a vocational expert retained by Ms. Smith, testified that there were 1500 to 2500 jobs that Ms. Smith could perform within her geographic job area.[1] In addition, of course, the Commission had before it the evidence that Ms. Smith had worked for many years while morbidly obese, that at one point she had lost over forty pounds from her highest weight, and that she had worked for about one year after her fall despite her weight.

In contrast, Ms. Smith offered the testimony of Dr. Overesch. Dr. Overesch stated that after Ms. Smith fell she was permanently and totally disabled and unable to work. He was the only doctor to so testify. The Commission did not base its ruling on his opinion because it found that his testimony was not as credible as that of the other doctors in this case because it was not based on complete information. In particular, the Commission noted that Dr. Overesch examined Ms. Smith only twice and did not treat her for her injuries. It also noted that Ms. Smith did not tell Dr. Overesch that she

---

1. But Mr. McClellan also testified that realistically it would be hard for Ms. Smith to get one of those jobs because 1500 to 2500 jobs are not actually very many and because many of those jobs are given by employers to employees who have been injured on other jobs within the company.

worked in some capacity for approximately one year following her fall. This was, of course, inconsistent with his opinion that she was unable to work after her fall. Finally, the Commission also noted that Dr..Overesch did not know that Ms. Smith had worked for the last twenty years while morbidly obese and admitted that he had not reviewed Ms. Smith's job description or the dates she worked in forming his opinion.

■ Under our standard of review, we may not substitute our judgment of the evidence for that of the Commission. *Davis*, 903 S.W.2d at 571. The weight of the evidence and the credibility of the witnesses are ultimately for the Commission. *Id.* The Commission was free to find the testimony of Drs. Fenton, Folck, Craig, and Browning more credible than the testimony of Dr. Overesch and Mr. McClellan. The testimony of Drs. Fenton, Folck, Craig, and Browning provided substantial and competent evidence on which the Commission could base its ruling, and its ruling was not clearly against the overwhelming weight of the evidence.

Ms. Smith also contends that without regard to her obesity she is still permanently and totally disabled as the result of the combination of all of her injuries. She argues that her prior carpal tunnel, knee, and back injuries, and her unique sleep habits—due to the pain of her injuries she sleeps only four to five hours a night and must lay down for a couple of hours during the day—have required her to change her lifestyle and forced her to work more slowly and obtain assistance to complete her job responsibilities. It is evident, however, that the physicians noted above did not find that Ms. Smith was permanently and totally disabled by the combination of all of her injuries, including her morbid obesity; their testimony certainly permitted the Commission to conclude that she was not permanently and totally disabled if they did not consider her obesity.[2]

## IV. THE LABOR AND INDUSTRIAL RELATIONS COMMISSION DID NOT ERR IN FINDING THE CLAIMANT SUSTAINED PERMANENT PARTIAL DISABILITY OF 30% OF HER WHOLE BODY

The Commission affirmed the ALJ's award of a rating of 30% permanent partial disability of Ms. Smith's body as a whole. ConAgra contends that the extent of the permanent partial disability rating is not supported by the evidence and, if it is, then it is against the overall weight of the evidence.

■ After treating Ms. Smith for her 1987 primary injury, Dr. Fenton gave her a permanent partial disability rating of 19%. By contrast, Dr. Overesch rated her permanent partial disability at 30% of the whole person and Dr. Folck, who evaluated Ms. Smith for the Second Injury Fund, rated her permanent partial disability at 24% of the whole person. The ALJ found Ms. Smith had a 30% permanent partial disability rating and the Commission adopted the ALJ's finding. In so doing, it implicitly accepted Dr. Overesch's 30% disability rating. The Commission determines credibility, *Davis*, 903 S.W.2d at 571, and it was free to accept some parts of Dr. Overesch's testimony and reject other parts. The fact that there was also evidence to support a finding of a lower degree of impairment does not require a reversal. *See Lawrence v. Joplin R–VIII School Dist.*, 834 S.W.2d 789, 795 (Mo.App. 1992).

For these reasons, we affirm the decision of the Commission in all respects.

All concur.

---

2. Ms. Smith raises the additional contention in the argument portion of her brief that even if this Court finds that she is not permanently and totally disabled, it should conclude that she has sustained permanent partial disability as a result of the combination of her preexisting disabilities with her current disabilities. This argument was not properly preserved for our review because it was not raised in the Point Relied On. Issues raised only in the argument portion of a brief, and not in a Point Relied On, are not preserved for review. *Taylor v. Taylor*, 908 S.W.2d 361, 364 (Mo.App.1995).