Tommy LOVEN, Claimant–Respondent,

v.

**GREENE COUNTY, Employer–Respondent,**

**and**

**Missouri State Treasurer, as Custodian of the Second Injury Fund, Additional Party–Appellant.**

**No. 23910.**

Missouri Court of Appeals, Southern District, Division Two.

Nov. 21, 2001.

Application for Transfer Denied Dec. 12, 2001.

Application for Transfer Denied Jan. 22, 2002.

Jeremiah W. (Jay) Nixon, Attorney General and Shari Lynn Lockart, Assistant Attorney General, Jefferson City, for Appellant.

William Ringer, Evans & Dixon, Kansas City, for Employer-Respondent.

Randy C. Alberhasky, Springfield, for Claimant-Respondent.

PHILLIP R. GARRISON, Judge.

The decisive issue in this workers' compensation case is whether Tommy Loven's ("Employee's") morbid obesity was a preexisting permanent partial disability and constitutes the basis for an award against the Second Injury Fund (the "Fund"). Under the facts here, we hold that the Labor and Industrial Relations

Commission (the "Commission") erred in entering an award against the Fund.

Employee sustained a back injury on July 29, 1997 (the "back injury"), when he fell while turning over a 200 pound truck tire for the purpose of repairing it for his employer, Greene County, Missouri ("County"). At that time, he was almost forty-eight years of age, 6'1" tall, and weighed between 375 to 390 pounds. Testimony indicated that Employee had been morbidly obese most of his adult life. He said that he had tried to diet for years, but that the only time he was successful at it was his early twenties when his weight went from 300 to 210 pounds. During the seven years prior to Employee's injury, he said that he weighed from 360 to 390 pounds.

Employee completed the eleventh grade and later obtained his GED. Between the time he quit school and the back injury, he worked as a welder; leased a gas station and did mechanical work; serviced cars; fixed flat tires and sold gas; was a dry grocery order filler requiring constant lifting of up to 80 pounds; fixed truck and heavy road equipment tires that required lifting tires and wheels that weighed up to 220 pounds; worked as an iron worker where he had to work up to 120 feet off the ground and either walk or crawl on structural steel; worked on a ranch where he worked seven days a week for seven months and "pull[ed]" over 400 calves weighing up to 120 pounds; leased and ran a pool hall; and was a security guard which involved going in and out a door and up and down steps 200 times per day.

Employee worked for the County from 1976 until April 1979 fixing flat tires on road graders, dump trucks and tractors. Employee was again hired by the County in 1990 and worked during the months of April through November for two years mowing right of ways. After two years he "got on full time" with the County and stayed in its employment until the injury that resulted in this workers' compensation claim. Initially, that full time work was on the "bridge crew" building and lifting, with the help of another person, concrete forms weighing 250 to 300 pounds, as well as a lot of bending, stooping, and overhead work. Later, he operated a brush cutter for the County, and eventually became its "tire man" which included fixing tires on trucks and heavy equipment as well as mechanical work. This work included crawling under vehicles, climbing up and down out of road graders and diesel trucks, continual stooping, and lifting of tires and equipment weighing from 50 to 300 pounds. He described his work as "very physical, manual labor." Once he fixed a flat on the edge of a bridge where he had to tie a "lanyard around [his] waist and hold onto the tire until they helped [him] bring it away from the edge of the bridge."

During his employment with the County he worked full time, almost never missed work, worked numerous ten hour days, and worked lots of overtime. In fact, during one winter, he worked a thirty-seven hour shift. He also said that there had been times when his size helped him do his job, and that one of the reasons he was hired by the County was because of his ability to lift heavy objects. He described how his size helped in his job with the County by saying, "[w]hen you're going in a 20-foot ditch and you've got a flat grader tire, a little man, a light-frame man, can't get that tire out of that ditch and up on top of the road. I always could. And that was one of the reasons I was hired the second time with Greene County, is because I was able to do the job."

The ALJ found that Employee was totally and permanently disabled, but that such disability did not all result from the

back injury sustained on July 29, 1997. Instead, the ALJ found that the total, permanent disability resulted from a combination of the back injury and the preexisting morbid obesity, and awarded Employee · 120 weeks ("30% BAW") of permanent partial disability compensation from the County, and permanent total disability compensation at the rate of $310.11 per week for his lifetime from the Fund. The Fund sought review by the Commission. The Commission affirmed the ALJ's award and incorporated it into its Final Award. The Fund appeals.

■ In reviewing a workers' compensation award, we review the findings of the Commission and not those of the ALJ. *Gordon v. Tri–State Motor Transit Co.,* 908 S.W.2d 849, 852 (Mo.App. S.D.1995). Where, as here, the Commission incorporates the ALJ's award and decision, we consider the findings and conclusions of the Commission as including the ALJ's award. *Kaderly v. Race Bros. Farm Supply,* 993 S.W.2d 512, 514 (Mo.App. S.D. 1999). Our review is a two-step process. *Davis v. Research Med. Ctr.,* 903 S.W.2d 557, 571 (Mo.App. W.D.1995). We first examine the whole record, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the award, in order to determine if the record contains sufficient competent and substantial evidence to support the award. *Id.* If there is sufficient competent and substantial evidence to support the award, we then determine if the award is against the overwhelming weight of the evidence, and in doing so we consider all the evidence, including that which is opposing or unfavorable to the award, in the light most favorable to the award. *Id.* In our review, we are mindful that we may not substitute our judgment on the weight of the evidence or on the credibility of witnesses for that of

the Commission. *Id.* Its interpretation and application of the law, however, are not binding on this Court and fall within our realm of independent review and correction. *Id.* Where the findings of ultimate fact are reached not by a process of natural reasoning from the facts alone, but rather by application of the law, it is a conclusion of law and subject to reversal by the court. *Id.*

In the first of its three points on appeal, the Fund contends that the Commission erred in awarding Employee permanent and total disability benefits from the Fund because Employee failed to prove that his obesity was a preexisting permanent partial disability of such seriousness as to constitute a prior hindrance or obstacle to employment or to obtaining reemployment if he became unemployed.

■ Some historical review is a necessary prelude to a discussion of liability of the Fund. The purpose of the Fund is twofold: to encourage the employment of individuals who are already disabled; and to relieve an employer or his insurer of liability for the previously disabled employee's total and permanent disability where that disability is not specifically attributable to an injury suffered during the period of employment with that employer. *Lawrence v. Joplin R–VIII School Dist.,* 834 S.W.2d 789, 793, n. 2 (Mo.App. S.D. 1992), citing *Roby v. Tarlton Corp.,* 728 S.W.2d 586, 589 (Mo.App. E.D.1987). Said another way, the "Fund was established in order to assure employers that the hiring of workers with a permanent partial disability would not expose the employer to liability for a greater amount of disability than that which resulted from a compensable work-related injury." *Searcy v. McDonnell Douglas Aircraft Co.,* 894 S.W.2d 173, 178 (Mo.App. E.D.1995). *See also Meilves v. Morris,* 422 S.W.2d 335, 338 (Mo.1968).

The version of Section 287.220.1, RSMo, in effect prior to 1993, provided the statutory basis for liability by the Fund. It provided that in order to recover from the Fund, a claimant must have had a "permanent partial disability whether from compensable injury or otherwise." That requirement was judicially interpreted as requiring the establishment of a preexisting "industrial disability" to insure that the statute would be used only for those who had previously suffered a bona fide work-related disability. *See Leutzinger v. Treasurer,* 895 S.W.2d 591, 592 (Mo.App. E.D.1995), citing *Wilhite v. Hurd,* 411 S.W.2d 72, 77 (Mo.1967).

In *Wilhite,* the Missouri Supreme Court said that the preexisting permanent partial disability requirement for liability by the Fund "relates to disability to work and means 'industrial disability' or loss of earning capacity, rather than physical impairment as such." 411 S.W.2d at 77. *See also Searcy,* 894 S.W.2d at 177, citing *Carron v. Ste. Genevieve Sch. Dist.,* 800 S.W.2d 64, 68 (Mo.App. E.D.1990) ("An industrial disability is a disability adversely affecting a claimant's earning capacity or ability to work, rather than a mere physical impairment as such."); *Anderson v. Emerson Elec. Co.,* 698 S.W.2d 574, 577 (Mo.App. E.D.1985) ("[P]reexisting disability" which invokes liability by the Fund "must be such as to partially disable the claimant from work and impede his labors," and "must relate to a disability to work, an industrial disability affecting earning capacity, rather than physical impairment as such."). In *Meilves,* 422 S.W.2d at 339, the Missouri Supreme Court held that a claimant failed to establish a claim against the Fund when she failed to produce substantial evidence of any industrial disability prior to the work-related injury. *See also Garibay v. Treasurer of Missouri,* 930 S.W.2d 57, 59 (Mo. App. E.D.1996)(Under the "industrially disabling" standard, past circumstances were viewed as indicia of the prior condition's seriousness, and the inquiry was based on the effect of the injury on the employee's ability to perform work-related duties before the primary injury.). It has been said, however, that unfortunately, the phrase "industrial disability" was sometimes misconstrued so as to deprive individuals from the benefits of the Fund if they previously worked regularly, although in pain, and with limitations upon their physical abilities. *Culp v. Lohr Distrib. Co,* 898 S.W.2d 613, 614 (Mo.App. E.D. 1995).

Section 287.220.1 was amended in 1993 to provide that the basis for liability of the Fund is a "preexisting permanent partial disability whether from compensable injury or otherwise, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed." Section 287.220.1.[1] It has been said that this

---

1. Section 287.220.1, as amended in 1993, provides, in pertinent part:

All cases of permanent disability where there has been previous disability shall be compensated as herein provided ... If any employee who has a preexisting permanent partial disability whether from compensable injury or otherwise, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed ... If the previous disability or disabilities, whether from compensable injury or otherwise, and the last injury together result in total and permanent disability, ... the employer at the time of the last injury shall be liable only for the disability resulting from the last injury considered alone and of itself; except that if the compensation for which the employer at the time of the last injury is liable is less than the compensation provided in this chapter for permanent total disability, then in addition to the compensation for which the employer is liable and after the completion of payment of the compensa-

amendment was an effort to eliminate the inconsistencies flowing from the subjective standards of "industrially disabling," and to provide a more objective standard by which liability by the Fund is to be determined. *Culp*, 898 S.W.2d at 614. In *Leutzinger*, 895 S.W.2d at 592–93, the court said that the legislature amended Section 287.220.1 "to make it clear which preexisting conditions would be considered serious enough to trigger the statute." It also said that "we expect that any preexisting injury which could be considered a hindrance to an employee's competition for employment in the open labor market should trigger [Fund] liability." *Id.* at 593.

Now, in order for there to be Fund liability, a claimant has the burden of proving that he had a preexisting permanent partial disability of such seriousness as to constitute a hindrance or obstacle to his employment or reemployment, and that such preexisting disability existed at the time the work-related injury was sustained. *Tidwell v. Kloster Co.*, 8 S.W.3d 585, 589 (Mo.App. E.D.1999); *Carlson v. Plant Farm*, 952 S.W.2d 369, 373 (Mo.App. W.D.1997). The Fund is not available where the employee is not shown to have had a preexisting disability at the time of the subsequent work-related injury. *Tiller v. 166 Auto Auction*, 941 S.W.2d 863, 865 (Mo.App. S.D.1997). *See also Lammert v. Vess Beverages, Inc.*, 968 S.W.2d 720, 725 (Mo.App. E.D.1998) (The preexisting disability necessary to trigger Fund liability is permanent partial disability existing at the time of the work-related injury.). As an extension of that concept, it is important to note in this case that, as between the employee and employer, a preexisting but non-disabling condition

does not bar recovery of compensation if a job-related injury causes the condition to escalate to the level of disability. *Avery v. City of Columbia*, 966 S.W.2d 315, 322 (Mo.App. W.D.1998). "If substantial evidence exists from which the Commission could determine that the claimant's preexisting condition did not constitute an impediment to performance of claimant's duties, there is sufficient competent evidence to warrant a finding that the claimant's condition was aggravated by a work-related injury." *Id.*, citing *Miller v. Wefelmeyer*, 890 S.W.2d 372, 376 (Mo.App.1994). *See also Atkinson v. Peterson/T & P Foundation*, 962 S.W.2d 912, 916–17 (Mo. App. S.D.1998); *Weinbauer v. Grey Eagle Distrib.*, 661 S.W.2d 652, 654 (Mo.App. E.D.1983).

"Disability" is defined as "inability to do something"; "deprivation or lack of esp. of physical, intellectual, or emotional capacity or fitness"; "the inability to pursue an occupation or perform services for wages because of physical or mental impairment"; "a physical or mental illness, injury, or condition that incapacitates in any way." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976). *Coloney v. Accurate Superior Scale Co.*, 952 S.W.2d 755 (Mo.App. W.D.1997), is also instructive in considering the meaning of "disability" in the context of a workers' compensation case. That case involved an occupational disease but the court's discussion of the harm to be compensated for in a workers' compensation setting is illustrative. The court said:

> The "injury" requirement of the Act necessitates that the employee's "injury" create a harm that tangibly affects the employee's earning ability.... Requir-

---

tion by the employer, the employee shall be paid the remainder of the compensation that would be due for permanent total disability

under section 287.200 out of a special fund known as the "Second Injury Fund"....

ing that the harm tangibly affect the employee's earning ability upholds the intent of the legislature in enacting the Worker's Compensation Act which was to provide indemnity for loss of earning power and disability to work and not for pain, suffering, or mere physical ailment.... [W]hile missing work suggests the requisite earning loss, other factors are considered in determining whether and at what point an employee has lost earning ability.

*Id.* at 760. In finding that the claimant suffered a compensable injury, the court noted that while he had never missed work, other factors existed indicating he had the requisite loss of earning ability such as his inability to perform various vocational tasks. *Id. See also Feltrop v. Eskens Drywall and Insulation,* 957 S.W.2d 408, 413 (Mo.App. W.D.1997) ("[W]hether or not the employee misses work, if the injury is shown to have harmed the employee's earning capacity, it is enough to constitute a disability under the workers' compensation statutes."); *Simmerly v. Bailey Corp.,* 890 S.W.2d 12, 14 (Mo.App. S.D.1994)("Workers' compensation insurance indemnifies a worker for loss of earning power resulting from a disability to work ... It is not indemnification for a physical ailment."); *Martin v. Mid-America Farm Lines, Inc.,* 769 S.W.2d 105, 109 (Mo.1989)("Workers' compensation is designed to provide compensation for loss of earning capacity.") In keeping with the definition of "disability" and the purpose of workers' compensation as being to indemnify for a loss resulting from a disability to work, or harm to earning capacity, it is logical that the "preexisting permanent partial disability" referred to in Section 287.220.1 relates to a condition that affects or has the potential to affect an ability to work and earn. This is fortified by the additional requirement in that statute that the "disability" be of such

seriousness as to constitute a hindrance or obstacle to employment or reemployment.

■ Here, there was insufficient evidence concerning a preexisting permanent partial disability. Dr. Norbert Belz ("Dr. Belz"), who began treatment of Employee on the day of the back injury, diagnosed diffuse degenerative disease involving the lumbar and lower thoracic area with very prominent osteophytes, and advanced degenerative disease of both hips. Within three weeks, Employee reported to Dr. Belz that his back was not any better, his pain was so severe that he could not clean himself after a bowel movement, and he was "markedly uncomfortable on any kind of motion."

Employee was referred to Dr. Ted Lennard ("Dr.Lennard"), a physical medicine and rehabilitation physician, beginning in December 1997. Dr. Lennard diagnosed "discogenic back pain," and discharged him from his care after three visits with a diagnosis of low back pain with underlying disc abnormalities, and a permanent lifting restriction of twenty-five pounds. He rated Employee as having a "15–percent total body rating for his lower back," with 7% of that for his degenerative changes and 8% for his back injury. He explained that the back injury resulted in an injury to "the disc," but that the injury may also have caused the underlying degenerative changes to become symptomatic. Dr. Lennard did say that Employee's obesity had affected his recovery from the back injury because it was difficult for him to exercise, and that he would expect a person to have a better recovery from his back injury if he was not morbidly obese. Dr. Lennard expressly said that he was not rendering an opinion about "disability," and when asked if Employee's preexisting obesity was an "impairment," he said that, "if you consider morbid obesity a physical impairment then, yes, I would consider

that, that he had a preexisting impairment." He said that he was not able to render an opinion about the extent of any impairment from the preexisting morbid obesity, and could not say if Employee had any limitations from his obesity when he last saw him. He did say that it would be reasonable to say that the combination of the morbid obesity and the back injury would cause more impairment than either one separately.

Employee was then seen by Dr. Andrew Myers ("Dr.Myers"), an occupational medicine specialist, at the request of his attorney approximately eight months after the back injury. Dr. Myer's testified, by way of deposition, that Employee had suffered a herniated disc at L3–L4. He said that Employee's morbid obesity would markedly impair his recovery from the back injury, and concluded that Employee was permanently totally disabled, attributing 75% of his disability to the back injury, and the remaining 25% to his preexisting "condition," i.e., obesity. He qualified that by saying, "I certainly think that there would be people who would take issue with my apportionment on this case. I don't think a lot of people would take issue with my assignment of disability, but I think some would take issue with my apportionment."

Dr. Brenda Wells ("Dr.Wells"), a physician specializing in weight management, testified that Employee had been morbidly obese most of his adult life. In response to a question about whether she had an opinion as to whether or not Employee's morbid obesity, as it existed prior to the back injury, had the "potential" to be a hindrance or obstacle towards employment, Dr. Wells said that if Employee kept carrying around excessive weight that "could limit his phyical—limit his employ-

ment in any type of physical demanding job or job that required certain physical requirements." She said that morbid obesity is a disease or condition that Employee will always suffer from.

Wilbur Swearingin ("Swearingin"), a vocational rehabilitation expert, testified that Employee's morbid obesity did not affect his ability to do his work for the County, but was a hindrance to his potential reemployment. He added, "I thought it certainly had the potential, if he had some certain other disabilities to combine with those and make it for a greater disability." He said that Employee is not "employable in the open labor market" because of his ambulation, his difficulty cleaning himself,[2] the amount of time he spends in bed, the physical restrictions that he has been given, his work background, the kind of work he's performed, his educational level, work skills, "all of those factors together."

▆▆▆ In the instant case, there was evidence from which the Commission could find that Employee's obesity was permanent. Dr. Wells testified that morbid obesity is a disease that Employee will always suffer with, and Dr. Lennard testified that generally morbidly obese people are not successful at losing weight. The real issue is whether, in Employee's case, his morbid obesity was a preexisting permanent partial disability of such seriousness as to constitute a hindrance or obstacle to employment or reemployment. A "permanent partial disability" is one that is permanent in nature and partial in degree. *Williams v. Pillsbury Co.*, 694 S.W.2d 488, 489 (Mo.App. E.D.1985); Section 287.190.6.

The ALJ found:

Notably, prior to the accident of July 29, 1997, [Employee] suffered from morbid

2. There was evidence that Employee could not turn around to clean himself after a bowel movement.

obesity, which presented a hindrance and obstacle to employment. (Although [Employee] testified that his condition did not cause any hindrance or obstacle to employment, and helped him in his work as an ironworker, I am persuaded that this condition was a hindrance and an obstacle to employment.) Further, the morbid obesity suffered by [Employee] has complicated and hindered the nature and extent of [his] low back treatment and recovery process. [Employee's] present complaints of pain include consideration of his morbid obesity.

The ALJ noted that Employee's morbid obesity had precluded a more definitive diagnosis of his back condition, and that Employee was not a surgical candidate so long as Employee remained morbidly obese. The ALJ found that Employee sustained a permanent partial disability of 30% of his body as a whole, referable to his low back which "presents a hindrance and obstacle to employment, and causes [Employee] to be governed by several restrictions." [3] He also found that Employee's morbid obesity was a "preexisting medical condition and disease" that "presented a hindrance and an obstacle to employment," and that its combination with the back injury rendered Employee unemployable in the open and competitive labor market. Although the ALJ did not find that the morbid obesity was a preexisting disability, that finding was made by the Commission in its Final Award without any further explanation or reference to any supporting testimony or evidence.

The Fund makes a compelling argument that the evidence does not demonstrate that Employee's weight was a preexisting permanent partial disability, or a hindrance or obstacle to his employment or re-employment. It points out that Employee himself said that his weight was not a hindrance or obstacle in any employment he had held and, in fact, was a benefit. Likewise, the evidence is clear that his weight was not a hindrance or obstacle in Employee changing jobs over the years, or in being re-employed by the County after an absence of eleven years during which he worked at other physically demanding jobs.

In responding to that argument, the Commission said it sounded similar to the old "industrial disability" test which it said was rejected in *Wuebbeling v. West County Drywall*, 898 S.W.2d 615, 620 (Mo.App. E.D.1995), where the appellate court said that the proper focus of the inquiry as to the nature of the prior disability is not on the extent to which the condition has caused difficulty in the past, it is on the potential that the condition may combine with a work-related injury in the future so as to cause a greater degree of disability than would have resulted in the absence of the condition. *See also Garibay v. Treasurer of Missouri*, 930 S.W.2d 57, 60 (Mo. App. E.D.1996), citing *Wuebbeling* and saying that "[i]f a cautious employer could reasonably foresee that there is the potential for the preexisting injuries to combine with a work-related injury and that combination would have a greater degree of disability than without the prior condition, then the preexisting injury would constitute 'a hindrance or obstacle to employment or reemployment if the employee became unemployed.'" Neither of those cases, however, purported to eliminate or diminish the explicit statutory requirement that there be a preexisting permanent partial disability. We interpret them as

---

**3.** The alleged preexisting disability here is Employee's morbid obesity, not his back injury.

merely indicating that prior interference with employment was not necessarily the test.

It is significant, however, that *Wuebbeling* was written after the legislature amended Section 287.220.1, but primarily involved a discussion and criticism of the previous "industrial disability" standard to the extent it had been interpreted as requiring missed work or diminished earnings prior to the subsequent work-related injury. In doing so, it acknowledged the fact that an employee may be able to successfully perform in particular work environments with certain disabilities and not experience an "industrial disability," *i.e.*, a disability to work or loss of earning capacity rather than a physical impairment as such. Thus, *Wuebbeling* cited 2 Arthur Larson, The Law of Workmen's Compensation § 59.31(a) (1994), referring to a worker with blindness in one eye who could perform a job as well as a worker with unimpaired eyesight, but who would be permanently and totally disabled if a work-related injury caused the loss of the other eye. 898 S.W.2d at 618. The example was explained thusly: "... despite the fact that the worker blind in one eye is equally capable of performing the work, in the absence of a Second Injury Fund an employer would have a strong incentive either to withhold employment or, if the condition resulted from non-work related causes during employment, to terminate employment in order to save on compensation insurance premiums." *Id.*

The *Wuebbeling* court said that "[i]n its place, the legislature has defined the nature of the preexisting disability which will give rise to [Fund] liability—*i.e.*, 'a preexisting permanent partial disability whether from compensable injury or otherwise, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee

becomes unemployed....'" *Id.* at 620–21. The fact is, as recognized by *Wuebbeling*, a preexisting permanent partial disability is required under Section 287.220.1 as a condition of liability by the Fund. This was and is true both before and after the 1993 amendment to that statute because the only change, which is pertinent here, made by the legislative amendment to Section 287.220.1 in 1993 was to add the words "preexisting," and "of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed" to the previous statutory language of "permanent partial disability whether from compensable injury or otherwise." Under both versions, a "permanent partial disability" was and is required, and under the 1993 version, the preexisting permanent partial disability must be of such seriousness as to constitute a hindrance or obstacle to employment or reemployment.

The *Wuebbeling* court recognized that each of the factors utilized under the previous "industrial disability" standard might well be of evidentiary value in establishing that an employee did, in fact, suffer from a prior disability, but questioned whether any or all of those criteria could properly be viewed as the exclusive means of determining liability of the Fund. 898 S.W.2d at 618.

Obesity has been considered in at least two Missouri cases as it relates to liability by the Fund. In *Smith v. ConAgra, Inc.*, 949 S.W.2d 917 (Mo.App. W.D.1997), claimant was 5'3" tall and had weighed between 187 and 287 pounds. After falling at work she was diagnosed with soft tissue injuries to her shoulders, legs and back, as well as morbid obesity. A doctor testified that claimant's injuries were "complicated by her obesity," and he noted that although she had tried to and did lose weight, she was unable to keep it off. *Id.*

at 919. The doctor testified that claimant's obesity "hampered" her recovery from her injuries. *Id.* Just as in the instant case, the ALJ found that claimant was permanently and totally disabled, awarded 30% permanent partial disability against the employer, and also awarded compensation from the Fund. On review, the Commission affirmed the finding of 30% permanent partial disability against the employer, but found that the evidence did not support the claim for permanent total disability benefits against the Fund. *Id.* The award was affirmed on appeal, with the court focusing on the lack of proof that claimant was totally permanently disabled, rather than on whether the preexisting obesity was a preexisting permanent partial disability under § 287.220.1.

*Garibay v. Treasurer of Missouri,* 964 S.W.2d 474 (Mo.App. E.D.1998), was the third time the award of the Commission denying Fund benefits to the claimant was reversed by the Eastern District of this court. First, it was reversed and remanded for the Commission to reconsider the denial of such benefits in light of the 1993 amendment to § 287.220.1. *See Garibay v. Marcraft, Inc.,* 899 S.W.2d 553 (Mo.App. E.D.1995). Then it was reversed and remanded when the Commission denied Fund benefits under the "hindrance or obstacle" standard using the same factors it had previously utilized in its earlier "industrially disabling" evaluation. *Garibay v. Treasurer of Missouri,* 930 S.W.2d at 60. Following that remand, the Commission again denied Fund liability, finding that the claimant's preexisting conditions, including morbid obesity, were not permanent conditions and thus he had no preexisting permanent partial disabilities. On the third and final appeal, the appellate court reversed and remanded the case for the entry of an award of permanent and total disability against the Fund. 964 S.W.2d at 480. In doing so, the court

relied heavily on the fact that all the evidence demonstrated that claimant had a preexisting disability of sleep apnea and undisputed preexisting disabilities of injuries to his wrist, left knee and ankle and right elbow. It also said that there was no evidence to support a finding that claimant's morbid obesity was not a permanent partial, preexisting disability at the time his work injury was sustained. *Id.* at 479. In that case, however, the evidence was that claimant had previously had trouble walking because of his weight and a knee that had previously been operated on, and he had problems bending, lifting and squatting. *Id.* at 477.

In the instant case, Employee's testimony thoroughly demonstrated that he was able to fully execute the requirements of his various occupations over a span of many years. This included activities such as lifting, stooping, bending, crawling, going up and down stairs, doing overhead work, and working at heights on structural steel. Not only did his testimony demonstrate the lack of interference with his employment by reason of his obesity, but it also demonstrated that other aspects of his life were not inhibited because of it. Employee said that prior to the back injury he had no problems sitting for any length of time, lifting his legs, sleeping, driving for extended distances, reaching to clean himself after a bowel movement, bending over to put on his socks and shoes, and he did not have to take breaks during the day. Additionally, he had been a very active hunter, hunting ducks, quail, geese, turkey, deer and elk, and "could walk 20 miles," could "carry the deer out," and had no trouble getting up into tree stands that were up to twelve feet off the ground. He "always rode lots of horses," fished three to four times per week, played pool every day, and played poker a couple of times per week. Employee's wife testified that

he had always been very active prior to the back injury, and that prior to that time he had no problems dressing himself or caring for his personal hygiene; he worked at a variety of jobs, some of which included some very heavy work with lots of bending; and he had no physical limitations. In short, we are not directed to any evidence indicating that Employee's employment or active lifestyle was affected by his weight, or that there was any activity, for which he was otherwise qualified, that would be adversely affected by his physical condition prior to the back injury. Unlike *Garibay v. Treasurer of State of Mo.*, there is no evidence that his weight imposed severe restrictions on his physical abilities and stamina, and because of Employee's own testimony, the statement in *Garibay v. Treasurer of State of Mo.* that "[t]here is no evidence to support a finding that claimant's morbid obesity was not a permanent partial, preexisting disability at the time of the [work injury]" is inapplicable. 964 S.W.2d at 479. Additionally, unlike the instant case, *Garibay* said that the only evidence regarding obesity, sleep apnea and other preexisting conditions supported a finding that they were permanent and disabling conditions. *Id.* at 480.

Here, contrary to Employee's own comprehensive testimony, there was evidence from some of the physicians and a vocational expert that Employee would have been affected in his physical/vocational activities because of his weight. Swearingin, the vocational expert, although admitting that Employee's obesity had not affected his ability to work for the County, testified that Employee's preexisting obesity contributed to certain limitations in his ability to function in the labor market, and would have impaired him in acquiring certain other occupations. He said that such activities as climbing scaffolding or ladders; walking on narrow, slippery, or moving surface areas; working at heights in ex-

posed places such as a structural beam; repetitive crouching or crawling; or working on machinery or equipment would have been impaired by a person who is extremely large.

This was despite Employee's own testimony that he had, over the years, climbed ladders to get in and out of heavy machinery; repetitively walked up and down stairs; walked and crawled on exposed structural steel at heights of 70 to 120 feet off the ground; crawled under equipment and vehicles in the process of changing tires; had no limitations in crawling or climbing; and generally performed job functions involving stooping, bending, walking, standing, sitting, or reaching. Employee's testimony graphically indicated that he had not been impaired in any way in performing any of these activities. In fact, Employee testified that he had never had any problems physically doing any of his jobs prior to the back injury. Contrary to Swearingin's apparent assumption about Employee's physical limitations, Employee indicated that he was successfully able to perform all such activities prior to his back injury. The only limitation associated with obesity identified by Swearingin, which was not directly contradicted by Employee was his ability to move on slippery or moving surfaces. Employee did testify, however, that "[w]hen you're going in a 20—foot ditch and you've got a flat grader tire, a little man, a light-frame man, can't get that tire out of that ditch and up on top of the road. I always could."

Swearingin also said that obesity was classified as a vocational impairment, meaning a limitation in performing the physical functions of work. As indicated earlier, however, an "impairment" and a "disability" are not necessarily the same in the workers' compensation setting. This distinction is also indicated in *Carlson*, 952

S.W.2d at 374–75, where the court found it significant that a doctor vacillated between the terms "impairment" and "disability" "indicating that he may not possess a thorough understanding of the term 'permanent total disability.'"

No authority is cited to us, and we have found none, indicating that a person is necessarily disabled if there is any conceivable occupation that he would not be able to perform because of his condition. Likewise, we are not cited to any authority holding that if a preexisting condition would hinder or be an obstacle in acquiring any conceivable type of occupations, it would qualify as a hindrance or obstacle under § 287.220.1. The "hindrance or obstacle" provision of § 287.220.1 obviously refers to a hindrance or obstacle to obtaining employment or reemployment for which the employee would otherwise be qualified. Otherwise, a preexisting condition that would be a hindrance or obstacle to obtaining *any* employment regardless if the applicant was otherwise qualified for the position would result in a false and inappropriate test for applicability of that statute.

Dr. Wells testified that morbid obesity "quite often can be a hindrance in employment." She explained that Employee's morbid obesity, as it existed prior to the back injury, "could limit his physical—limit his employment in any type of physical demanding job or job that required certain physical requirements." She explained:

Prior to [the back injury] the morbid obesity of [Employee] did not seem to be affecting his job performance up to the point of his injury. It would have limited his employability in maybe certain areas, something that required like extensive stair climbing, something that required him to be on his feet for extended periods of time, extensive walking, extensive bending or stooping. Any type of ladder climbing would have definitely been a hinderance [sic] because of his weight.

Not only was this testimony contrary to what Employee testified to, but Dr. Wells also later admitted that she knew of no employment that Employee had difficulty with, and that by his statement to her that he had no physical limitations, she took that to mean that he had no difficulty climbing stairs, or in walking, bending, stooping, and ladder climbing. Dr. Wells said that she would not have placed any specific restrictions on Employee's activities prior to the back injury because of his obesity other than "as tolerated." She did not say that Employee had a "preexisting permanent partial disability" prior to the back injury.

Dr. Myers recounted that Employee did not indicate to him that his weight had ever caused him any problems, and that he had had a very active lifestyle. He said that Employee was permanently and totally disabled, attributing 75% of the disability to his back injury and 25% to his preexisting obesity, but added that "I certainly think that there would be people who would take issue with my apportionment on this case." Dr. Myers qualified his apportionment, however, by saying that the 25% were from "his pre-existing degenerative changes and weight problems."

Dr. Lennard, when asked if Employee had sustained a permanent partial *impairment* as a result of the back injury, testified that he thought Employee had a 15% total body rating for his lower back, apportioned 7% to degenerative changes, and 8% to the back injury. He specifically said that he was not rendering any opinions about "disability." When asked if Employee had a preexisting "impairment" because of his morbid obesity, Dr. Lennard said, "Well, if you consider morbid obesity a physical impairment then, yes, I would

consider that, that he had pre-existing impairment." When asked how much "impairment" he would assign to Employee's preexisting morbid obesity, Dr. Lennard said, "Well, I would have to have talked with [Employee] to see what functional limitations that he had as a result of the obesity." He said that he was not capable of rendering an opinion on whether Employee had an impairment from his preexisting obesity. When asked to explain the difference between "impairment" and "disability," Dr. Lennard said, "Impairment is strictly physical. It's provided by physicians based on objective findings. A disability takes into consideration the physical but also adds in various social factors such as loss of function, work issues, social issues, education and creates a disability." Dr. Lennard's testimony did not include an opinion that Employee's weight was a preexisting permanent partial disability.

■■■ Fund liability is only triggered by a finding of the presence of an actual and measurable disability at the time the work injury is sustained. *Messex v. Sachs Elec. Co.*, 989 S.W.2d 206, 215 (Mo.App. E.D. 1999). There was no evidence to support such a finding here. We are cited to no authority holding that obesity, morbid or otherwise is, as a matter of law, a permanent partial disability for purposes of Fund liability. If such were the case, numerous absurd results would obtain. For instance, many professional football linemen weighing 350 pounds would be considered as thereby having permanent partial disabilities solely as a result of their weight. We do not believe that the 1993 amendment to Section 287.220.1 was intended to apply in that manner. It was never intended to be a form of health insurance. *Lawrence*, 834 S.W.2d at 793.

*Aycox v. Nat'l Carriers, Inc.*, 21 Kan. App.2d 665, 905 P.2d 1082 (1995), is instructive in this regard. The issue there was whether morbid obesity was a preexisting "handicap." The Workers' Compensation Board ruled that it did not find as a matter of law that morbid obesity was recognized as a preexisting condition that would constitute a handicap *per se* so as to require liability to pass to the Fund. In affirming that decision, the court said an employee is not handicapped if he or she is not at a disadvantage in obtaining employment or reemployment because of a condition. *Id.* 1083. In addressing the issue of whether morbid obesity is a handicap, the court said that it can be, but the issue is fact driven, and there the employee did not consider himself impaired and had no handicap in being reemployed by his employer. *Id.* The court concluded:

> Simply put, we can find no evidence in the record to indicate [employee] ever had any difficulty obtaining employment due to his obesity. [Employee] testified his obesity did not interfere at all with his ability to perform his job. Since [employer] rehired [employee], he was not disadvantaged in obtaining employment due to his obesity.

*Id.*

■■■ As indicated, the first step of our review is to determine if the award is supported by competent and substantial evidence after reviewing the whole record, and viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award. *Davis*, 903 S.W.2d at 571. The courts define competent evidence as relevant and admissible evidence that can establish the fact at issue. *Consolidated Sch. Dist. No. 2 v. King*, 786 S.W.2d 217, 219 (Mo.App. W.D. 1990). "Substantial evidence" implies and comprehends competent evidence and as evidence that, if believed, would have probative force upon the issues. *Id. See also State ex rel. Marco Sales v. Pub. Serv. Comm'n.*, 685 S.W.2d 216, 218 (Mo.App.

W.D.1984) (Substantial evidence means evidence, which, if true, has probative force upon the issues and implies and comprehends competent, not incompetent evidence.). The facts found by the Commission are binding on this court so long as those facts are supported by substantial evidence and are not contrary to the overwhelming evidence that was before the Commission. *Reese v. Coleman,* 990 S.W.2d 195, 199 (Mo.App. S.D.1999).

In this case, we are constrained to hold that the statutory element of a "preexisting permanent partial disability ... 'of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment" was not proven by competent and substantial evidence. Accordingly, the award must be reversed and the case remanded to the Commission for further proceedings, including consideration of whether Employee should receive an award for total permanent disability against the County. Because of this result, we do not reach the other two points raised on the Fund's appeal.

BARNEY, C.J., and RAHMEYER, J., concur.