**Deborah L. GASSEN, Appellant,**

v.

**Paul O. LIENBENGOOD, Defendant,**

**Treasurer of the State of Missouri— Custodian of the Second Injury Fund, Respondent.**

No. WD 62944.

Missouri Court of Appeals, Western District.

May 18, 2004.

John B. Boyd, Kansas City, for appellant.

Kimberley Cox Fournier, Kansas City, for respondent.

Before VICTOR C. HOWARD, P.J., HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

Deborah L. Gassen ("Claimant") appeals a decision of the Labor and Industrial Relations Commission ("the Commission") denying Second Injury Fund ("the Fund") liability.

We affirm.

Sometime in 1993, Claimant began experiencing pain and numbness in her hands while working as a paralegal for Paul Liebengood ("Employer"). On January 25, 1995, Claimant visited a doctor to address this condition. About two weeks after her

doctor's visit, on February 6, 1995, Claimant was injured while working for Employer when a bookcase fell on her. In May 2001, Claimant settled with Employer a claim for injuries she alleged occurred on January 18, 1995, and also on February 6, 1995, in the accident. Claimant then amended her claim to seek recovery from the Fund. The case was tried before an Administrative Law Judge. The Administrative Law Judge ("ALJ") denied Fund liability, concluding that although Claimant was permanently and totally disabled, this disability was caused by the February 1995 accident alone. The Commission affirmed this decision. Claimant appeals.

## Factual Background

From 1987 through 1998, Claimant worked for Employer as a paralegal. Sometime around 1993, she began experiencing pain and numbness in her hands and arms. Claimant testified that as a result of this pain, she had difficulty sleeping and working. Her work duties at that time included frequent typing. While she did not see a doctor immediately, Claimant testified that her gynecologist told her at the end of 1993 that he "figured it was carpal tunnel syndrome." This advice prompted her to wear braces on her arms and take over-the-counter medication. Sometime at the end of 1994, Employer became aware of Claimant's problems and persuaded her to see a doctor. On January 25, 1995, she visited Dr. Truett Swaim, who told her to wear splints at night for comfort and take vitamins. This was the first time she consulted a doctor for the purpose of addressing this pain. The doctor did not limit her duty.

On February 6, 1995, about two weeks later, Claimant was injured while working for Employer. A bookcase fell on her after she pulled a book from the shelf. The bookcase, which was about ten feet high and contained numerous books, knocked Claimant to the floor. The record does not provide a clear description of Claimant's fall. Claimant testified that she was not certain how it happened, but eyewitnesses told her that her head and right shoulder hit Employer's desk. She also thought she may have fallen with hands outstretched, perhaps jamming both wrists while striking her back, head, shoulder, and torso. Claimant experienced pain that evening, and she had difficulty sleeping. She visited Dr. Andrews the following day and complained of pain in her head, neck, lower back, right shoulder, and jaw. Initially, she was treated with bed rest for three days and muscle relaxants containing Tylenol. She returned to work, but the pain persisted.

At the hearing, Claimant testified to her work history following the accident. Claimant continued to work for Employer through May 1995, when she took some time off. In June 1996, she returned to work for Employer part-time, but she was unable to adequately perform her duties. At that point, Claimant and Employer mutually agreed that she should quit. Claimant found employment as a secretary, then as a paralegal. Despite numerous accommodations by employers, Claimant quit working in September 2000. She has not worked since that time.

About one month after the February 1995 accident, Claimant returned to Dr. Swaim, whom she had consulted in late January about the carpal tunnel issue. Dr. Swaim advised her to continue wearing the splints. According to Dr. Swaim's records, the splints were helping with the pain in Claimant's arms. However, the pain and numbness continued. Claimant underwent several surgical procedures. On August 17, 1995, Dr. Lanny Harris performed an anterior transposition of the ulnar nerve at the right elbow. At that

time, Dr. Harris also performed a carpal tunnel release and a cubital tunnel release on her right arm. Finally, on March 27, 1996, Dr. Harris performed a carpal tunnel release on Claimant's left arm. The medical records indicate that Dr. Harris presumed that these injuries were connected to the February 1995 accident. In any event, Dr. Harris diagnosed this pain as carpal tunnel syndrome.

From 1995 through 2001, Claimant saw multiple doctors and underwent several surgical procedures to treat additional injuries that apparently resulted from the February 1995 accident. These procedures included a multi-level fusion on her neck (from C4 to C7), an arthroscopic debridement of the left and right mandibular joints of the jaw, a right craniomandibular open-joint anthroplasty of the jaw, and an arthroscopic subacromial decompression of the right shoulder. The most recent procedures occurred in 2001. On March 8, 2001, Claimant had another surgery on her neck, a fusion at C3–4. And on July 12, 2001, Claimant underwent another surgery on her jaw, an open-jointed surgery on her left temporomandibular joint.

In May 1998, Claimant filed a workers' compensation claim against Employer for the February 1995 accident. This claim alleged injuries to the "head, neck, back, shoulders, upper and lower extremities and body as a whole." It alleged, moreover, liability against the Fund, claiming that these injuries combined with cumulative injuries to the upper extremities (dated January 18, 1995) to produce permanent and total disability.

In May 2001, Claimant settled a claim with Employer and his insurer based on injuries she claimed were suffered "on or about January 18, 1995." This "compromise settlement" (pursuant to section 287.390)[1] stated that the injuries "[arose] out of and in the course of her employment" with Employer. It contained a lump-sum payment of $10,000.00. It also noted that Employer and his insurer had already paid $22,089.00 in medical expenses relating to these injuries. In a separate agreement on the same day, Claimant also settled the February 1995 claim. The terms of that settlement included the payment of $3,560.96 in temporary partial disability, $28,153.66 in temporary total disability, and $127,600.00 in medical expenses. This settlement, moreover, included a lump-sum payment of $40,000.00 (at the time of settlement) and an annuity providing a payment of $53,000.00 (on June 17, 2020). As the final part of the settlement, Employer and his insurer also agreed to establish a "Custodial Agreement for Future Medical Expenses" of Claimant, which included the purchase of an annuity that pays into the medical fund. This settlement—as well as the settlement for the January injuries—was approved by an ALJ.

A few months thereafter, in October 2001, Claimant filed an amended claim against the Fund. Claimant once again alleged that injuries in January 1995 combined with the February 1995 injuries to produce permanent and total disability. At the hearing before the ALJ, Claimant introduced the deposition testimony of Dr. Brent Koprivica, who conducted medical evaluations of Claimant in 2000 and 2001. Dr. Koprivica testified that Claimant was permanently and totally disabled as a result of the January and February injuries combined. Claimant also presented evidence that no employer in the usual course of business would reasonably be expected to employ Claimant. As exhibits, Claimant also offered the two settlements be-

1. All statutory references are to Revised Statutes of Missouri (2000).

tween herself and Employer and medical records spanning six years.

The ALJ denied the Second Injury Fund claim, concluding that Claimant's permanent and total disability was caused by the February 1995 accident alone. The Commission affirmed this decision. This appeal follows.

## Analysis

Our review is limited to whether, considering the whole record, there is sufficient competent and substantial evidence to support the Commission's award. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003); *see also* Mo. CONST. art. V, § 18. When the Commission affirms or adopts the findings of an ALJ (as it has done here), we review the decision and findings of the ALJ as adopted by the Commission. *Reese v. Gary & Roger Link, Inc.,* 5 S.W.3d 522, 524 (Mo.App.1999).[2]

In her first point, Claimant argues that the Commission erred in finding that her disability was caused by the February 1995 accident alone. Rather, Claimant says, it was caused by a combination of these injuries and a preexisting condition (carpal tunnel syndrome). According to Claimant, the carpal tunnel syndrome was cognizable at the time of the February 1995 accident. Thus, Claimant argues that the Commission erred in finding that no actual or measurable disability preceded the primary injury.

Section 287.220 creates the Second Injury Fund. The purpose of the Fund is to encourage employers to hire partially disabled applicants. *Meilves v. Morris,* 422 S.W.2d 335, 338 (Mo.1968). The hiring of such individuals raises the possibility that the partial disability will combine with a later, on-the-job injury to produce a greater (if not total) permanent disability. *Wuebbeling v. West County Drywall,* 898 S.W.2d 615, 617–18 (Mo.App.1995). The legislature wanted to assure employers that, in such cases, they would not be exposed to a greater amount of liability than that which results from the work-related injury. *Searcy v. McDonnell Douglas Aircraft Co.,* 894 S.W.2d 173, 178 (Mo.App.1995). Thus, it limited the employer's liability to that part of the disability that can be attributed to the last injury alone. *Roller v. Treasurer of State,* 935 S.W.2d 739, 741 (Mo.App.1996).

Another purpose of the Fund is to provide the employee compensation for that portion of the disability that can be attributed to the preexisting condition. *Stewart v. Johnson,* 398 S.W.2d 850, 853 (Mo.1966). The Fund is liable for that portion. *See Kizior v. Trans World Airlines,* 5 S.W.3d 195, 201 (Mo.App.1999); *see also* § 287.220.1. In order to be entitled to Fund liability, the claimant must establish either that (1) a preexisting partial disability combined with a disability from a subsequent injury to create permanent and total disability or (2) the two disabilities combined to result in a greater disability than that which would have resulted from the last injury by itself. *Karoutzos v. Treasurer of State,* 55 S.W.3d 493, 498 (Mo.App.2001). It is the first combination that is at issue here. Under this factual situation, "[i]f claimant's last injury in and of itself rendered the claimant permanently and totally disabled, then the Second Injury Fund has no liability." *Hughey v. Chrysler Corp.,* 34 S.W.3d 845, 847 (Mo.App.2000).

**2.** *Reese* and other cases cited in the discussion of our analysis were overruled on other grounds in *Hampton,* 121 S.W.3d at 222–23.

■ The parties do not dispute the current existence of a permanent and total disability. Total and permanent disability occurs when no employer in the usual course of business would reasonably be expected to employ the Claimant in her present physical condition. *Carlson v. Plant Farm*, 952 S.W.2d 369, 373 (Mo.App. 1997). Rather, the issue is whether the injuries suffered from the February 1995 accident are the sole cause of the disability or whether these injuries combined with a pre-existing partial disability to produce the total disability.

The deposition of Dr. Brent Koprivica was the only medical testimony that addressed this central issue. Dr. Koprivica conducted medical evaluations of Claimant in 2000 and 2001. He opined that as a result of the injuries dated January 18, 1995, Claimant suffered from a 30% permanent partial disability to the whole body. Dr. Koprivica further claimed that Claimant had a 75% permanent partial disability to the whole body as a result of the February 1995 accident. Overall, Dr. Koprivica concluded that these disabilities combined to permanently and totally disable Claimant.

The ALJ ruled in favor of the Fund, stating in part:

> The liability is triggered only by a finding of the presence of an actual and measurable disability at the time the work injury is sustained. . . . In January 1995 the Claimant first sought treatment for her carpal tunnel syndrome and was treated with splints and B–12 vitamins. . . .
>
> The fact that the Claimant's carpal tunnel syndrome had developed weeks before the February 1995 accident and [was] improving with treatment prior to the accident leaves the Court (sic) no way to determine the presence of actual or measurable disability at the time of the February 6, 1995 work injury. If the primary injury alone is enough to permanently and totally disable the Claimant, then it is irrelevant if any injury or condition preexisted the primary injury. If the total disability is caused solely by the primary injury, there can be no Second Injury Fund liability. From the injuries of February 6, 1995, the Claimant sustained multiple injuries to her cervical spine requiring multiple level fusions, TMJ syndrome requiring three surgeries, a right shoulder decompression, back pain, gastrointestinal pain and headaches and scalp pain. The Claimant is currently bothered by headaches, which causes nausea, vomiting, bowels and vision problems and the consensus of medical opinions attributes those conditions to the February 1995 head trauma and neck injury. . . .
>
> I find based on these multiple conditions of ill arising from the February 6, 1995 accident the Claimant's current complaints and the inability for her to compete in the open labor market is not a result of any combination of an alleged preexisting conditions and her last accident of February 6, 1995. . . .

The Commission affirmed the determination of the ALJ.

■ In order to calculate Fund liability, the Commission must determine the percentage of the disability that can be attributed solely to the preexisting condition *at the time of the last injury. Carlson*, 952 S.W.2d at 373; *see also* § 287.220.1. It need not be shown that the claimant or the employer knew of the preexisting disability prior to the work injury. *Messex v. Sachs Elec. Co.*, 989 S.W.2d 206, 214 (Mo.App. 1999). However, the claimant must establish that an actual or measurable disability existed at this time. *Id; see also Tidwell v. Kloster Co.*, 8 S.W.3d 585, 589 (Mo.App.

1999). The disability must be "of such seriousness as to constitute a hindrance or obstacle to [her] employment." *Loven v. Greene County*, 63 S.W.3d 278, 283 (Mo. App.2001).

Two weeks prior to February 6, 1995 (the date of the last injury), Claimant saw a doctor to address the pain and numbness in her arms. That doctor prescribed splints and B–12 vitamins, and Claimant returned to work. At the time of the accident, Claimant was not under any work restrictions, nor had she undergone any surgical procedure. While these facts suggest that Claimant had some impairment—either of a temporary or permanent nature—prior to the February 6 accident, we cannot say it was unreasonable for the Commission to conclude that her pain or impairment did not rise to the level of a permanent partial disability constituting a hindrance to her employment. Moreover, any impairment she did have is irrelevant unless it combines with the second injury to produce a greater disability than would have resulted from the last injury itself.

Dr. Koprivica, who offered his opinion that she suffered a 30% permanent partial disability attributable to her preexisting injuries, evaluated Claimant six years after the accident. Dr. Koprivica had the medical records of only one office visit prior to February 6, 1995, to consider. Claimant had seen the doctor for carpal tunnel one time, had not missed any time from work, had not been restricted in her activities by the doctor, did not change her work routine, and was instructed only to wear splints at night and take vitamins. Dr. Koprivica testified merely that Claimant told him that her condition caused her difficulty at work prior to the accident. Under the circumstances, Dr. Koprivica had little basis to declare his opinion. Thus, the Commission reasonably determined that his testimony was not probative regarding that issue. The Commission was not required to accept Dr. Koprivica's opinion. It "was free to accept or reject any evidence, even medical evidence." *Lorentz v. Mo. State Treasurer*, 72 S.W.3d 315, 322 (Mo.App.2002).

■ Claimant cites the numerous procedures she underwent to address the carpal tunnel syndrome, including the right and left carpal tunnel release and the anterior transposition of the right ulnar. The first of these procedures was done six months *after* the work-related accident. Preexisting conditions are not denominated "disabilities" as of the date of the second injury simply because, at some point in the future, they combine with that injury to render the claimant permanently and totally disabled. *See Wilhite v. Hurd*, 411 S.W.2d 72, 77–78 (Mo.1967) (preexisting cataract was not sufficiently disabling at the time of workplace accident even though its natural progression thereafter caused a loss of vision), *superseded by statute on other grounds as stated in Kasl v. Bristol Care, Inc.*, 984 S.W.2d 852, 853 (Mo. banc 1999).

■ Claimant has the burden of establishing all of the essential elements of her claim. *Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 241 (Mo.App.2003). Claimant's own testimony, like Dr. Koprivica's testimony, suggests that she had a condition that had not matured into a disability at the time of the second injury. The evidence does not establish that, independent of the second injury, it was cognizable as a permanent disability.

We conclude that the Commission could reasonably determine that there was "no way to determine the presence of actual or measurable disability at the time of the February 6, 1995, work injury." In other words, there was substantial evidence to support the conclusion that Claimant had failed to show the presence of such disabil-

ity. Moreover, there is substantial evidence to support the conclusion that the bookcase accident was the cause of her total disability, completely independent of any prior injury.[3] Point denied.

### Points II and III: May 2001 Settlement

■ In her second point, Claimant argues that the May 2001 settlement between herself and Employer conclusively establishes a preexisting disability. This settlement involved injuries suffered "on or about January 18, 1995."[4] Claimant points out that the right to workers' compensation is fixed as of the date of the injury. *See* § 287.190.1. She argues that this fact, when considered in light of the settlement, proves that she suffered a preexisting disability.

Claimant alludes in her brief to a claim she filed prior to February 6, 1995. As part of her claim for the February injuries, which she filed in May 1998, Claimant included a claim against the Fund for injuries dated January 18, 1995. Nevertheless, the record does not establish that a separate claim for the January injuries was filed before the February accident.

Claimant points to no authority in support of her assertion that the settlement for the January injuries compels Fund liability or is binding on the Fund in any way. On the contrary, the Fund is not bound by a settlement between a claimant and the employer to which it was not a party. *Totten v. Treasurer of State,* 116 S.W.3d 624, 628–29 (Mo.App.2003). Point II denied.

■ In her final point on appeal, Claimant complains of a statement made by the ALJ regarding the May 2001 settlement. In his final award, the ALJ noted that he found of "some importance" that this settlement failed to apportion the preexisting disability to any part of Claimant's body. According to Claimant, this statement "improperly invokes the principle of *res judicata.*" The Claimant thus asserts, in effect, that the Commission misapplied the law. We disagree.

Initially, we note that Claimant's position here seems inconsistent. Claimant argues, on the one hand, that the Commission should have considered the settlement as establishing a preexisting disability. On the other hand, Claimant contends that the Commission should not have considered and evaluated the settlement's contents. In any event, the statement may merely have been a comment on the evidence. To the extent that the ALJ was implying that the settlement was not binding on the Fund, he was correct, as we have already noted. Moreover, the ALJ, who also happened to have been the ALJ who presided over the settlement approvals, may simply have been saying that the failure to apportion any disability to the January injury is consistent with the conclusion that it was impossible to determine

3. Incidentally, it is not necessarily clear that the statute creating the Fund would allow recovery against the Fund when the Claimant has settled both the primary claim and the claim for pre-existing disability with the Employer at the same time. Claimant received compensation for her alleged carpal tunnel syndrome from the Employer. At the same time, she also received compensation from the Employer for the bookcase injuries. We need not decide the issue here because there was no error in the Commission's finding that there was no combination of pre-existing dis-

ability and primary accident disability producing a greater disability than the disability caused by the primary accident alone.

4. The record discloses nothing pertinent to the date of January 18, 1995. The Claimant's appointment with the doctor occurred on January 25. The medical records give no indication that January 18 was the date of an injury. We suppose that it was the date claimant decided to see a doctor about her wrist pain.

the degree of any disability that existed prior to the bookcase accident. The Commission did not misapply the law. Point denied.

### Conclusion

For the foregoing reasons, we conclude that the Commission's award is supported by competent and substantial evidence on the whole record.

HOWARD and LOWENSTEIN, JJ., concur.