**Ronald MICHAEL, Claimant–
Appellant,**

v.

**TREASURER, State of Missouri, as
Custodian of the Second Injury
Fund, Respondent–Respondent.**

No. SD 30365.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 23, 2011.

Motion for Rehearing and Transfer
Denied March 17, 2011.

Application for Transfer Denied
April 26, 2011.

John O. Newman, Newman Law Firm, Springfield, MO, for Appellant.

Chris Koster, Attorney General, Jefferson City, MO, and Susan F. Colburn, Assistant Attorney General, Springfield, MO, for Respondent.

GARY W. LYNCH, Judge.

Ronald Michael ("Claimant") appeals from the final award of the Labor and Industrial Relations Commission ("Commission") finding the Second Injury Fund ("SIF") liable for compensation for permanent partial disability benefits. Claimant contends the Commission erred "as a matter of law" in its award of benefits for permanent partial disability rather than for permanent total disability and the award is contrary to the overwhelming weight of the evidence. Finding no such errors, we affirm.

### Factual and Procedural Background

Claimant, born October 8, 1954, was employed by United Parcel Service ("Employer") as a delivery driver beginning in February 1986. In his employment, Claimant routinely used an electronic handheld computer into which he entered information by using his thumbs. Such entries were made "thousands of times per day[.]" Claimant drove a delivery truck with a standard transmission and was required to lift packages weighing up to seventy pounds by himself and up to 150 pounds with assistance.

On December 17, 2002, while unloading packages, Claimant attempted to catch a heavy package he had placed on the edge of a loading dock. When the package started to tip, Claimant reached down and pushed with his left arm extended to move the package back, and he immediately felt something pop in his neck. Pain extended from his left shoulder up to the left side of his neck. Claimant reported the injury to Employer the same day, but when asked whether he needed medical attention, Claimant declined and completed his shift. In the following months, Claimant continued to work his regular shifts and perform his normal duties, although he continued to

experience constant pain on the left side of his neck and into his left shoulder. Occasionally he had to ask for help from his supervisor to complete his shift. Claimant reported to Employer that the pain persisted, but when he was asked again whether he needed medical attention, he declined.

In February 2003, Claimant began to feel pain in both hands. While driving, Claimant's hands ached so badly that he had to alternate his hands on the steering wheel every twenty seconds. One morning in particular, the pain was great enough he could not hold a cup of coffee. At that time, he told Employer that he needed to see a doctor. Claimant complained that his hands would ache at night and awaken him and then his hands would become numb, "almost like they weren't there."

Claimant underwent an MRI on March 19, 2003, which revealed "degenerative disc disease, spondylitic bulge left C3–4 and C5–6 with spinal stenosis C4–5 and C5–6, and C6–7 small disc protrusion[.]" Claimant stopped working on April 28, 2003, although medical records revealed that Claimant was released to return to work on May 8, 2003, with restrictions. Such restrictions included no repetitive lifting, no prolonged standing or walking, no pushing and/or pulling, no reaching above shoulders, and "[s]hould be sitting 90 percent of the time."

On May 22, 2003, Claimant saw Dr. J. Cole, who at that time "diagnosed degenerative disc disease left C–5, possible C–6 radiculitis, right carpal tunnel syndrome, neck sprain secondary to radiculitis." Dr. Cole prescribed physical therapy, epidural steroid injections, and anti-inflammatories.

Claimant next saw Dr. Evenson on June 11, 2003, at which time Evenson diagnosed "cervical radiculopathy C–5 or C–6, probable right carpal tunnel syndrome." On June 3 and July 3, 2003, epidural steroid injections were administered. Claimant "was returned to light duty work on" July 18, 2003. On August 8, 2003, Claimant was diagnosed as having "multi-level degenerative disc disease with sciatica, neck pain, and numbness in all four extremities."

Claimant was diagnosed with bilateral carpal tunnel syndrome following a "nerve conduction study/EMG" on August 11, 2003, which revealed "right median neuropathy at the wrist consistent with moderate carpal tunnel syndrome and left moderate median neuropathy at the wrist consistent with carpal tunnel syndrome with no radiculitis[.]" "Degenerative disc disease of the cervical spine" was also a diagnosis. Dr. Cole provided wrist splints for Claimant's carpal tunnel syndrome. An x-ray of Claimant's left shoulder in August 2003 indicated "Type II acromion and healed old fracture of the clavicle."

A cervical discogram was performed on October 23, 2003, indicating "C6–7 painful disc, C3–4 and C5–6 mild non-concordant pain." Claimant saw Dr. Cole on October 28, 2003, "and was advised that no surgery was necessary." He was placed on permanent restrictions and ordered to avoid pushing, pulling, and overhead activities and to refrain from lifting more than twenty pounds. Over-the-counter anti-inflammatories were recommended. Dr. Cole rated Claimant's disability related to his neck and shoulder injury at 5% of the body.

Claimant was not under any kind of active treatment when he saw Dr. David T. Volarich in April 2004. Dr. Volarich's report from April 14, 2004, indicates that Claimant reported neck pain and extremely painful range of motion; making turns while driving is difficult, "and he cannot

look up for a prolonged period of time at a stoplight." "He tells me this is his greatest hindrance to employment." Volarich noted that Claimant's neck hurts even when stapling papers, he reported seeing squiggly lines occasionally, and that "lifting is difficult, even lifting a cup of coffee can be painful." Dr. Volarich testified that at the time of Claimant's "last injury," Claimant "was on some temporary restrictions[,]" but he did not believe any restrictions were permanent.

In reference to Claimant's December 17, 2002 injury, Dr. Volarich testified:

It was my opinion that as a result of 12/17/02 accident, he had a 30 percent permanent partial disability of the body as a whole rated at the cervical spine due to the disc protrusion of C6–7 to the left, as well as the aggravation of degenerative disc disease and degenerative joint disease from C3 through C7. The rating accounted for his considerable loss in motion, persistent neck pain, difficulties with multiple activities, particularly the overhead, or when using the neck in an extended fashion, as well as weakness in the upper extremities.

Following physical and neurological examinations, Dr. Volarich opined that the injury Claimant sustained on December 17, 2002, "was the substantial contributing factor causing the disc protrusion at C6–7 to the left, as well as the aggravation of degenerative disc disease and degenerative joint disease from C3 through C7, all that required extensive conservative care." As of April 2004, Volarich opined that Claimant had reached maximum medical improvement in regard to the injuries sustained on December 17, 2002. He assessed "a 30% permanent partial disability of the body as a whole rated at the cervical spine due to disc protrusion at C6–7 to the left, as well as aggravation of degenerative disc disease and degenerative joint

disease from C–3 through C–7." Restrictions placed upon Claimant that were related to Claimant's neck and shoulder complaints included: limit repetitive bending, twisting, lifting, pushing, pulling, carrying, climbing to an as-needed basis; no lifting weight greater than twenty pounds; should not handle weight over head, away from body, or for long distances or over uneven terrain; avoid remaining in fixed position for longer than thirty to forty-five minutes; change positions frequently; and pursue appropriate stretching, strengthening, and range-of-motion exercises as well as non-impact aerobic conditioning.

Regarding Claimant's bilateral carpal tunnel syndrome, Volarich opined that "the repetitive nature of [Claimant's] work, . . . are the substantial contributing factors causing the development of bilateral carpal tunnel syndrome that has not been surgically repaired." At that time in 2004, it was his opinion that Claimant had not achieved maximum medical improvement in regard to the carpal tunnel syndrome, and Dr. Volarich declined to assign a disability rating for Claimant's hands and wrists. In regard to the combined effect of the December 17, 2002, injury and the disability resulting from the bilateral carpal tunnel syndrome diagnosis, Dr. Volarich opined that "[t]he combination of his disabilities creates a substantially greater disability than the simple sum or total of each separate injury/illness, and a loading factor should be added."

On April 28, 2004, Claimant filed a claim for compensation against Employer for the repetitive trauma to his wrists and hands, alleging an August 11, 2003 injury date ("last injury"), and against the SIF, alleging permanent partial disability based upon a pre-existing disability resulting from the December 17, 2002 injury to his neck and left shoulder ("pre-existing disability").

Claimant underwent a carpal tunnel release on Claimant's right arm on July 13, 2004, and a similar surgery was performed on September 14, 2004, on Claimant's left arm. Although the numbness he reported experiencing at nighttime eased, he continued to experience aches and pain, in addition to tingling sensations.

Dr. Volarich re-evaluated Claimant on January 28, 2008, for the purpose of an independent medical examination only. He based his evaluation on a clinical assessment, examination, and review of the available documentation, part of which was obtained from Claimant's attorney. At that time, Claimant reported no change in the symptoms related to his neck and shoulder, and Dr. Volarich's disability rating from Claimant's neck and shoulder injury did not vary from his initial rating in April 2004.

As to Claimant's bilateral carpal tunnel syndrome, Dr. Volarich assigned a rating of 35% permanent partial disability for Claimant's right upper extremity rated at the wrist, and a 35% permanent partial disability of the left upper extremity rated at the wrist. In addition, he assigned a rating of 15% permanent partial disability of the body as a whole due to the combination of injuries to both upper extremities and a 15% multiplicity factor due to the injuries to both upper extremities. Again, Dr. Volarich opined that "[t]he combination of [Claimant's] disabilities creates a substantially greater disability than the simple sum or total of each separate injury/illness, and a loading factor should be added." He expressed no opinion regarding Claimant's employability; instead, he suggested that Claimant "might benefit from a vocational assessment[.]"

Claimant consulted with Wilbur Swearingin, a certified vocational rehabilitation counselor, who evaluated him on May 5, 2008. Claimant was not working at the time of Swearingin's examination and was receiving Social Security disability benefits. Claimant reported two primary complaints: first, chronic neck, upper back, and left-arm pain, numbness, and tingling; and, second, numbness, tingling, and pain in his hands and wrists.

In his testimony, Swearingin acknowledged that Claimant had an average I.Q., he had completed high school, his academic skills were adequate, he functioned independently, and although he had difficulty tucking in a shirt and tying his shoes, Claimant feeds and dresses himself. Claimant scored below the first percentile on manual dexterity tests, which Swearingin attributed to the carpal tunnel syndrome and which would eliminate the potential for employment in assembly and packaging occupations. Claimant stated that he took hot showers four or five times a day for temporary relief of his neck and arm pain, which, Swearingin opined, supported Claimant's claim of chronic pain.

Swearingin testified that, considering Claimant's "very poor neck movement, neck and upper back pain, and the carpal tunnel symptoms that recur[,]" skilled trades requiring good hand function and average or better upper extremity strength and dexterity would not be an option, therefore retraining would not "move him into competitive employment." He explained that competitive employment means full-time work, five days a week, forty hours per week. Swearingin believed that employment in common jobs would also be unlikely. He noted Claimant had no transferable skills and ruled out Claimant's return to work for Employer entirely. He opined that Claimant was precluded from performing many functions by his medical restrictions alone. Claimant's inability to remain in one position or perform repetitive manual tasks for at least one hour and fifty minutes due to his

discomfort limited his ability to stay at a task. Swearingin concluded that, given Claimant's impairments, pain, medical restrictions, limited education, and "advancing age," it was unreasonable to expect an employer to readily employ Claimant, and he believed Claimant was permanently and totally disabled. Swearingin attributed Claimant's disability to "a combination of the cervical spine issues, the chronic pain that he has from the cervical spine, the limited motion in his neck, as well as the limited ability to use his hands repetitively related to his carpal tunnel syndrome." He further testified, "I thought it was both of those problems together."

On June 1, 2009, a final hearing was held before an Administrative Law Judge ("ALJ") of the Division of Workers Compensation on the sole issue of the nature and extent of the SIF's liability. Claimant had previously settled his claims against Employer and its insurer arising from the December 2002 neck and left shoulder injury and the August 2003 bilateral carpal tunnel syndrome. The parties agreed that Claimant's weekly compensation rate for permanent total disability was $662.55 and for permanent partial disability was $347.05. At the hearing, Claimant and his wife testified, and depositions of Dr. Volarich and Wilbur Swearingin were admitted into evidence.[1] The SIF offered no evidence.

Claimant recounted the December 17, 2002 incident as related previously. Claimant stated that following that injury, he finished his shift and returned to work and his normal duties the next scheduled workday, although he continued to experience constant pain in his neck and left shoulder. He did not seek medical attention at that time, but he occasionally asked for help at work, and he "kept hurting more and more."

Claimant further related that in February 2003, both of his hands started hurting, and he sought medical attention at that time. Claimant testified that he had not experienced any problems with his hands before that time. Claimant worked full-time for Employer until he terminated his employment on April 28, 2003. After undergoing surgeries on both hands, Claimant reported that the surgeries relieved the numbness he experienced at nighttime, but his hands continued to tingle if he used them and continued to ache; pain in his left hand was "much worse" than that in his right hand. Driving for a long time produced aching and deep pain in his wrist and palm area, and writing caused his hand to go numb and tingle. Claimant further testified that grasping, grabbing, turning pages, holding a newspaper, wringing out a washcloth, and tying his shoes are difficult.

Claimant confirmed that no surgery was ever recommended for his neck and left shoulder complaints. When questioned about present problems with his neck and shoulder, Claimant testified that he experienced constant pain which spiked at times and awakened him "many times a night[.]" He takes no prescription medication and seldom uses over-the-counter medication. To relieve his pain, he stated, he "can lay on the floor for a few seconds to sometimes quite a while[,]" but he has trouble getting up off of the floor. Claimant further stated that it is painful to turn his chin toward either the right or left side,

1. Claimant did not introduce his medical records into evidence. All references in this opinion regarding the dates and nature of Claimant's medical treatment are taken from the history and medical records review of Dr. Volarich and Wilbur Swearingin, as offered into evidence at the hearing by Claimant without reservation and received into evidence without objection.

and he cannot turn his head to look behind him while driving.

Claimant testified that he worked at an auto dealership for a two-week period in July or August of 2005, but it hurt too much to climb in and out of the vehicles he had to drive. Claimant also stated that mowing his lawn had "been a big issue[,]" due to "bouncing up and down on the mower and the steering[,]" which hurts his neck and both hands. He stated that mowing, which formerly took him two-and-a-half hours, then took two or three days to complete, that he no longer could hunt or fish as much as he was formerly able to do, and that walking and standing were difficult for him.

Claimant's wife, Terri, testified that prior to Claimant's neck and shoulder injury sustained in December 2002, Claimant took care of their "[m]owing and upkeep, car repair and upkeep[,]" as well as helping her father with trimming or cutting trees, auto maintenance, and "just general maintenance." Following his injury in December 2002, Terri stated, it took Claimant a lot longer time to mow. After his injuries in 2002 and 2003, Terri testified, on visits to see their granddaughter, Claimant generally does not go with her because he cannot keep up with them—that he wears down and hurts. Furthermore, Claimant has trouble opening jars or anything small, cannot load or unload groceries, and generally does not accompany her on vacations because he is afraid he will hurt. She recalled a vacation they took to Florida the previous summer, which was when she first noticed Claimant "constantly doing the neck and trying to get it comfortable, and rubbing, and rubbing his hands."

The ALJ issued an award on July 24, 2009, finding the SIF liable for permanent partial disability benefits in favor of Claimant. The ALJ found that Claimant's pre-existing permanent partial disability was equal to fifty weeks of compensation, that the Claimant's permanent partial disability resulting from the last injury was equal to 134.75 weeks of compensation, and that a "15 percent load is appropriate due to the synergistic effect of combining the disabilities." The ALJ awarded Claimant $9,617.62 against the SIF for the excess permanent partial disability calculated by multiplying the sum of the number of weeks of permanent partial disability attributable to the pre-existing injury and the last injury, respectively, (50 + 134.75 = 184.75) by the 15% load factor (184.75 × 15% = 27.7125) and then multiplying that product of 27.7125 by Claimant's weekly compensation rate of $347.05 for permanent partial disability (27.7125 × $347.05 = $9,617.62).

Claimant applied to the Commission for review of the ALJ's award. Upon its finding that the ALJ's award was supported by competent and substantial evidence, the Commission unanimously affirmed the ALJ's decision and attached and incorporated the same in its final award issued on January 14, 2010. Claimant appeals from the Commission's final award.

### Standard of Review

■■■ "'Where the [Commission's] award attaches and incorporates the ALJ's award and decision, this [C]ourt considers the findings and conclusions of the Commission as including the ALJ's award.'" *Miller v. U.S. Airways Group, Inc.*, 316 S.W.3d 462, 465 (Mo.App.2010) (quoting *Cochran v. Indus. Fuels & Res., Inc.*, 995 S.W.2d 489, 492 (Mo.App.1999)). On appeal from a final award of the Commission, this Court will affirm the award unless we find that the Commission acted beyond its power, the award was procured by fraud, the facts do not support the award, or the award is not supported by sufficient com-

petent evidence. Section 287.495.1.[2] In our review, this Court "must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003). "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Id.* at 223. "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* Questions of law are reviewed *de novo*. *Ellis v. Mo. State Treasurer*, 302 S.W.3d 217, 219 (Mo. App.2009). On issues of fact and the weight and credibility accorded to conflicts in evidence, we defer to the Commission. *Id.* Furthermore, it is within the province of the Commission to determine credibility of witnesses. *Smith v. ConAgra, Inc.*, 949 S.W.2d 917, 922 (Mo.App.1997).

### Discussion

In a single point relied on, Claimant contends that the Commission's award of benefits for permanent partial disability was contrary to the overwhelming weight of evidence and unsupported by sufficient competent evidence, in that the Commission erred in failing to award benefits for permanent total disability because the combination of Claimant's December 17, 2002 injury and his August 2003 injury, as "a matter of law," resulted in permanent and total disability. Claimant argues that "[t]he only evidence in this case is that [Claimant] is permanently and totally disabled as a result of his bilateral carpal tunnel when combined with the injuries he sustained to his neck and left shoulder, his

age, his educational background and work history."

We initially note that Claimant fails to cite any legal authority supporting his claim that "as a matter of law" the Commission was required to find that he was permanently totally disabled or that, if so, it was due to a combination of his pre-existing disability and his last injury. Such a failure preserves nothing for appellate review. *Kent v. Charlie Chicken, II, Inc.*, 972 S.W.2d 513, 516 (Mo.App.1998). We now turn to the evidentiary basis for the Commission's determination.

Claimant bases his argument, in part, on his contention that there is no evidence in the record to dispute his evidence. While Claimant acknowledges that he has the burden to prove his claim, he appears to suggest that the SIF's failure to present evidence disputing "the fact that [Claimant] is permanently and totally disabled as a result of the combination of the Two (2) injuries[,]" supports his claim that the Commission's award was contrary to the overwhelming weight of the evidence.

The SIF, however, has no obligation to present conflicting or contrary evidence on the claim for permanent total disability benefits. *Dunn v. Treasurer of Mo.*, 272 S.W.3d 267, 275 (Mo.App.2008). Rather, Claimant "must prove the nature and extent of any disability by a reasonable degree of certainty." *Elrod v. Treasurer of Mo.*, 138 S.W.3d 714, 717 (Mo. banc 2004).

In cases where an employee's pre-existing partial disability combines with a subsequent compensable work injury to produce a greater permanent disability, the SIF is liable for that portion of the disability that is attributed to the pre-existing condition, limiting the employer's

**2.** References to statutes are to RSMo 2000, unless indicated otherwise.

liability to that part of the disability attributed to the last injury alone. *Gassen v. Lienbengood*, 134 S.W.3d 75, 79 (Mo.App. 2004). To find the SIF liable, a claimant must first "establish either that (1) a preexisting partial disability combined with a disability from a subsequent injury to create permanent and total disability or (2) the two disabilities combined to result in a greater disability than that which would have resulted from the last injury by itself." *Id.* The type of benefits that a claimant is entitled to recover from the SIF, whether permanent partial disability or permanent total disability, "depends on the resulting combination of [a] claimant's last injury and pre-existing permanent partial disabilities." *Dunn,* 272 S.W.3d at 272.

 Section 287.190.6(1) defines permanent partial disability as "a disability that is permanent in nature and partial in degree[.]" Entitlement to permanent partial disability benefits requires that the claimant prove that the last compensable injury, when combined with a pre-existing permanent partial disability, created a greater overall disability than the independent sum of the disabilities. *Dunn,* 272 S.W.3d at 272. "Permanent partial disability is not dependent on the employee's inability to work." *Cardwell v. Treasurer of State of Mo.,* 249 S.W.3d 902, 910 (Mo. App.2008).

 To be entitled to permanent total disability benefits, the claimant "must prove that the last injury, combined with his pre-existing permanent partial disabilities, result in permanent total disability." *Dunn,* 272 S.W.3d at 272. Permanent total disability "is the inability to return to any reasonable or normal employment." *Elrod,* 138 S.W.3d at 717. Under section 287.020.7, "[t]he term **'total disability'** shall mean inability to return to any employment and not merely mean inability to

return to the employment in which the employee was engaged at the time of the accident." The approved legal standard for determining permanent total disability applies two tests: in general, whether the claimant is able to compete on the open job market; and, specifically, whether an employer would reasonably be expected to employ the claimant in his or her present physical condition. *Mathia v. Contract Freighters, Inc.,* 929 S.W.2d 271, 275 (Mo. App.1996).

"In computing permanent and total disability in the situation where claimant suffers from a previous disability, the ALJ or the Commission first determines the degree of disability as a result of the last injury." *Garcia v. St. Louis Cnty.,* 916 S.W.2d 263, 266 (Mo.App.1995); Section 287.220.1. As to Claimant's last injury, the bilateral carpal tunnel syndrome, the Commission found that the disability to Claimant's wrists was severe and that, although "Claimant was not permanently and totally disabled from the last accident only[,]" it is due to "the disability to the hands that Claimant is unable to work in a number of professions requiring manual dexterity." The Commission found that this injury resulted in 134.75 weeks of permanent partial disability compensation, and neither party challenges that determination.

Next, the Commission determines "the degree or percentage of employee's disability that is attributable to all injuries or conditions existing at the time the last injury was sustained[.]" Section 287.220.1; *Garcia,* 916 S.W.2d at 266. Furthermore, Claimant must establish that an actual or measurable disability existed at the time of the last injury. *Gassen,* 134 S.W.3d at 80. Here, the Commission found that Claimant's pre-existing disability equaled 50 weeks of permanent partial disability compensation and neither party challenges

that determination. Because the determinative date is the time the last injury was sustained, "the [SIF] is not liable for any progression of claimant's preexisting disabilities not caused by claimant's last injury." *Garcia,* 916 S.W.2d at 266.

The final step in the analysis is a determination of whether, and if so, to what extent, the combined disability as of the date of the last injury exceeds the simple sum of the disability from the last injury and the pre-existing disability. Section 287.220.1. The Commission found this issue in the affirmative for the Claimant and assigned a 15% load factor to that excess permanent partial disability. Claimant contends on appeal that this determination is against the overwhelming weight of the evidence because there is "not sufficient competent evidence in the record to warrant the making of the Commission's award."

The Commission concluded that, while Claimant may very well be permanently and totally disabled as of the date of the hearing, his disability as of that date is due to a combination of the last injury and "a subsequent deterioration of the neck disability, which includes *degenerative* disc disease." In reaching this conclusion, the Commission considered Swearingin's statement that Claimant was in good general health when he began having problems driving and carrying, gripping, or holding onto packages and noted that much of

Swearingin's evaluation was based upon complaints that Claimant expressed in June 2008—more than five years after the injury to Claimant's neck and shoulder—rather than any complaints Claimant had at the time he "was released by Dr. Cole in November 2003 with only a five percent rating." [3] The Commission further based this determination on the following findings:

> While Claimant's evidence is that he now must constantly rub his neck and avoid activities that jar his neck, and Mr. Swearingin found that while Claimant takes as many as five hot showers per day to relieve neck pain, there is no evidence suggesting that Claimant was in that degree of pain prior to the development of the carpal tunnel syndrome. The fact remains that after December 2002, Claimant continued to work in a physically-demanding job until the development of his carpal tunnel symptoms. He even *declined* medical treatment until *after* the carpal tunnel symptoms appeared.

Dr. Volarich did not evaluate Claimant's neck or hands until April 2004. At that time, Dr. Volarich imposed a lifting restriction of 20 pounds, and limited Claimant to performing certain positions "as needed." But this was nearly six months after the release and ratings by Dr. Cole and well after the carpal tunnel

---

**3.** Claimant contends that "the only testifying doctor[,]" Dr. Volarich, did not opine that Claimant's condition had deteriorated, and there was "absolutely no medical evidence that his condition has deteriorated." While there is evidence that James K. Cole, M.D., assessed a rating of "five percent impairment of the whole person" in relation to Claimant's neck and shoulder injury, Claimant submits that this rating was not in evidence. However, the record in this case included an evaluation in the records submitted with Swearingin's deposition that noted a perma-

nent impairment rating from James K. Cole, M.D., on November 10, 2003, "due to cervical disorders," to the extent of "five percent impairment of the whole person because [Claimant] has some muscle spasm and guarding, mild loss of range of motion." Swearingin was further cross-examined as to this fact in his deposition testimony. As Dr. Cole's rating was included in Swearingin's report, which Claimant submitted, and testimony on the record, this rating was indeed in evidence.

syndrome had been diagnosed.[4]

There was no testimony that Claimant had to constantly rub his neck prior to the onset of the carpal tunnel syndrome symptoms. There is no evidence that in the two months following the December 2002 work accident and prior to the onset and diagnosis of carpal tunnel symptoms that Claimant was unable to perform any household chores. There is no evidence that in the two months subsequent to the December 2002 accident and prior to the onset of the carpal tunnel symptoms that Claimant could not travel.

In fact, he was still driving a truck. While Claimant indicated that he continued to experience pain during these two months, there is no evidence that he was relegated to taking five hot showers a day to relieve symptoms. It was the numbness in the hands that prompted him to seek medical care. Thus, if Claimant is permanently and totally disabled, it is due to a combination of the last accident with a subsequent deterioration of the neck disability, which includes *degenerative* disc disease.

Other than the very last sentence, Claimant does not challenge any of these findings as not being supported by substantial and competent evidence in the record.

Claimant offered no medical testimony that he was permanently and totally disabled at the time of the last injury as a result of the combination of the pre-existing disability and the last injury. *See Mell v. Biebel Bros., Inc.*, 247 S.W.3d 26, 29 (Mo.App.2008) (finding Commission's determination of permanent partial disability was supported by the evidence where none of the medical experts in that case, including Dr. Volarich, offered the opinion that the claimant was totally disabled); *compare ABB Power T & D Co. v. Kempker*, 236 S.W.3d 43, 48 (Mo.App.2007) (finding Commission's determination of permanent total disability was supported by substantial evidence where Dr. Volarich assigned disability ratings for each of claimant's injuries and opined that claimant was permanently and totally disabled as the result of all his injuries). Here, Dr. Volarich testified "[t]he combination of [Claimant's] disabilities creates a substantially greater disability than the simple sum or total of each separate injury/illness, and a loading factor should be added."[5] This testimony falls well short of a medical opinion that the pre-existing injury and the last injury combined in August 2003 to render Claimant permanently and totally disabled. Indeed, Dr. Volarich's testimony supports the Commission's award assessing a loading factor to the combined disabilities rather than finding Claimant was permanently and totally disabled at the time of the last injury.

While Swearingin, as a certified vocational rehabilitation counselor, was well qualified to render an opinion as to whether Claimant had the "inability to return to

---

4. At the time Dr. Cole released Claimant on November 10, 2003, he noted Claimant's "mild loss of motion." On April 1, 2004, Dr. Volarich observed that Claimant had "considerable loss of motion." By November 22, 2004, Dr. Shane Bennoch, as part of his diagnosis of Claimant, described Claimant as having "[s]evere cervical range of motion restriction." Contrary to Claimant's assertion that "[t]here is absolutely no medical evidence that [Claimant's] condition has deteriorated," these medical reports relied upon by Dr. Volarich and Swearingin show a progression from "mild" to "severe" loss of motion during 2004 and, thus, provide substantial and competent evidence of deterioration in Claimant's pre-existing disability.

5. Dr. Volarich, as he did in *Mell*, deferred to the opinion of a vocational expert on whether Claimant was employable in the open labor market. *Mell*, 247 S.W.3d at 29.

any reasonable or normal employment," *see Elrod,* 138 S.W.3d at 717, at the time of the last injury, he did not do so.[6] He only testified that Claimant met this standard as of the date of his exam—May 2008—almost five years later.

Without medical qualifications, however, Swearingin could not render a medical opinion as to the medical causation of Claimant's inability to work on that date. Thus, Swearingin's testimony provides no support for the proposition that Claimant's inability to return to any reasonable or normal employment in May 2008 was a result of Claimant's last injury—bilateral carpel tunnel syndrome—medically causing a deterioration of Claimant's pre-existing disability during the time between the last injury in August 2003 and Claimant's exam in May 2008. In the absence of Claimant's production of evidence supporting that proposition, the only evidence in the record as to the medical cause of such deterioration is Claimant's degenerative disc disease, as noted by the Commission.

▮▮▮ "Total disability preventing reasonable employment must be more than post-accident worsening of preexisting disabilities." *Elrod,* 138 S.W.3d at 717. Upon a claim for permanent total disability, the claimant "must show that the worsening was caused or aggravated by the primary injury." *Id.* Here, Claimant did not meet his burden. The Commission's conclusion that the extent of Claimant's disability at the time of the hearing was due to a subsequent deterioration of his pre-existing condition as a result of his degenerative disc disease is supported by sufficient competent and substantial evidence on the record as a whole and is,

thus, not against the overwhelming weight of the evidence. Claimant's point is denied.

### *Decision*

The Commission's award is affirmed.

BARNEY, P.J., and BURRELL, J., concur.

---

6. Swearingin's only characterization of Claimant's employability in August 2003 is that Claimant "had impairments which were vocationally disabling sufficient to constitute a hindrance or obstacle to employment prior to August 2003." This characterization does not rise to the level of permanent and total disability, as discussed *supra. See Elrod,* 138 S.W.3d at 717.